**Kimberlea A. ROE, Appellant,**

v.

**Blane LADYMON and Metro Townhomes & Homes, L.L.P., Appellees.**

No. 05–08–00417–CV.

Court of Appeals of Texas, Dallas.

July 30, 2010.

**506**

John J. Marek, Addison, TX, for Appellant.

Greg C. Noschese, David Jefrie Mizgala, Munsch Hardt Kopf & Harr, P.C., Dallas, TX, for Appellees.

Before Chief Justice WRIGHT and Justices MORRIS and MOSELEY.

## OPINION

Opinion By Justice MOSELEY.

Kimberlea A. Roe obtained an arbitration award against Blane Ladymon and Metro Townhomes & Homes, L.L.P. (Metro LLP), a Texas registered limited liability partnership. The trial court confirmed the award against Metro LLP, but vacated the award against Ladymon. Roe and Metro LLP appeal.

This case requires us to determine who—the arbitrator or the court—has the primary responsibility to decide whether a party to the dispute is bound by an arbitration provision in a contract between other parties. The answer to that question determines how we review the decision on whether the party is bound by the arbitration provision. We also consider whether the trial court erred by confirming the award against Metro LLP.

We conclude that Ladymon individually is not a party to the contract containing the arbitration clause, and he did not "clearly and unmistakably" agree to allow the arbitrator to decide issues of arbitrability. Therefore, the primary responsibility to decide the issue belongs to the court, not the arbitrator. We also conclude that the trial court—reviewing the issue de novo—did not err by finding that Ladymon was not individually bound by the arbitration provision. Lastly, we conclude the trial court—applying the deferential standard applicable to arbitration awards—did not err by confirming Roe's award against Metro LLP. Thus, we affirm the trial court's judgment.

## I. Background

In 2003, Roe contracted for Metro LLP to renovate her home. The contract defined Roe as the "Owner" and Metro LLP as the "Contractor." Ladymon signed the contract in his capacity as a partner of Metro LLP. Metro LLP's partners included Ladymon, Metro Townhomes and Homes, Inc. (Metro Inc.), and others.

The contract is a form prepared by the Home Builders Association of Greater Dallas. Paragraph 18 of the contract contained a detailed mediation/arbitration provision. That provision broadly defined a "Dispute" as "any controversy or claim or matters in question between the parties," and provided that the Owner and Contractor agreed to submit any Dispute to mediation, and to submit any unresolved Dispute to the American Arbitration Association (AAA) for binding arbitration pursuant to Federal Arbitration Act (FAA).[1] *See* 9 U.S.C. §§ 1–16 (2006).

On July 5, 2004, Ladymon, as president of Metro Inc., filed two documents with the Texas Secretary of State. One withdrew Metro LLP's registration as a registered limited liability partnership and the other was a certificate of limited partnership for Metro Townhomes Limited Partnership (Metro LP). The certificate stat-

---

1. The entire arbitration provision states:

 18. *MEDIATION–ARBITRATION/LIMITATION OF CLAIMS:* It is the policy of the State of Texas to encourage the peaceable resolution of disputes through alternative dispute resolution procedures. Owner and Contractor hereby agree that any controversy or claim or matters in question between the parties including, but not limited to, any matter arising out of or relating to (a) this Contract, and any amendments thereto, (b) any breach thereof, (c) the construction transaction reflected in the Contract, (d) the design or construction of the Improvements, (e) any alleged fraud, misrepresentations or breach of warranties, express or implied, (f) claims for defective design or construction of the Improvements, (g) intentional and/or negligent infliction of emotional distress, (h) violations of the Texas Deceptive Trade Practices–Consumer Protection Act, (i) violations of the Texas Residential Construction Liability Act, and/or (j) any other cause of action relating to or arising out of the construction and/or sale of the Improvements by Contractor, (herein referred to collectively as a *"Dispute"*), shall be submitted to mediation with the American Arbitration Association ("AAA") where the parties will endeavor to resolve the Dispute in an amicable manner. In the event any Dispute cannot be resolved by mediation, the Dispute shall be submitted to the American Arbitration Association (the "AAA") for binding arbitration pursuant to Title 9 of the United States Code, which the parties hereto acknowledge and agree ap- plies to the transaction involved herein, and in accordance with the Construction Industry Arbitration Rules of the AAA or such other rules as the AAA may deem applicable. If Title 9 of the United States Code is inapplicable to any such claim, dispute or controversy for any reason, such arbitration shall be conducted by the AAA pursuant to the Texas General Arbitration Act and in accordance with the Construction Industry Arbitration Rules of the AAA or such other rules as the AAA may deem applicable. In any such arbitration proceeding: (i) all federal and state law (including Chapter 27 of the Texas Property Code) and all statutes of limitations which would otherwise be applicable shall apply; and (ii) the proceeding shall be conducted by a single arbitrator. The arbitrator shall be selected by the process of appointment from a panel pursuant to the applicable procedures of the AAA. Any award rendered in any such arbitration proceeding shall be final and binding, and judgment upon any such award may be entered in any court having jurisdiction. If any party to this Contract files a proceeding in any court to resolve any such controversy, dispute or claim, such action shall not constitute a waiver of the right of such party or a bar to the right of any other party to seek arbitration of that or any other claim, dispute or controversy, and the court shall, upon motion of any party to the proceeding, direct that such controversy, dispute or claim be arbitrated in accordance herewith.

ed that Metro LLP was converting to a limited partnership, Metro LP. The certificate identified Metro Inc. as Metro LP's sole general partner and identified Ladymon as a limited partner. Ladymon testified his accountant advised him to change the form of the business for tax purposes. He testified there was no transfer or formal assignment of Roe's contract to Metro LP, and the partners continued to do the work on the project. Roe did not have actual knowledge of these filings.

Unsatisfied with the remodeling work, Roe demanded arbitration against both Metro LLP and Ladymon in June 2006. Attached to her arbitration demand was a demand letter addressed to Metro LLP and Ladymon. It alleged several construction defects and failures with the remodeling project and claimed damages under a number of legal theories.[2] Although we do not have a complete record of the arbitration proceedings or a transcript of the arbitration hearing, the record reflects that after an August 2006 preliminary hearing, which Ladymon attended, the arbitrator entered a scheduling order setting deadlines for disclosing witnesses, experts, and exhibits. The arbitrator also set the arbitration hearing for February 2007; the hearing was later rescheduled for May 7, 2007.

Roe served her witness, expert, and exhibit list on April 23, 2007. The next day, Ladymon faxed a letter (on Metro Inc. letterhead) to the arbitrator requesting a sixty-day continuance based on Roe's allegedly late disclosures, the need to retain experts to respond to Roe's experts, and the need to hire an attorney for the arbi-

tration hearing. On May 3, 2007, the AAA notified the parties that the arbitrator denied the continuance. Roe filed an additional disclosure of witnesses and attached several pages of new exhibits on May 4, 2007.

Metro LLP and Ladymon retained an attorney to represent them. At the beginning of the May 7, 2007 hearing, they filed five written objections to the arbitration proceeding, again requested a continuance, and requested that Ladymon be dismissed from the proceeding. Objections four and five[3] pertained to whether Ladymon was required to arbitrate Roe's claims against him:

> OBJECTION 4: Respondent Blane Ladymon has been named in his individual capacity but he has not signed an agreement to arbitrate in his individual capacity.

> OBJECTION 5: Respondent Blane Ladymon has been named in his individual capacity yet there have been no allegations in the demand for arbitration as to why or how he is liable. Nor is there any allegation that would support an award or finding that the limited liability provided by the entity should be disregarded.

The arbitrator denied the continuance, reserved ruling on Ladymon's objections until after the parties submitted post-hearing briefs, and proceeded with the hearing.

Ladymon's post-hearing brief argued that he signed the contract solely as a partner in a registered limited liability partnership (Metro LLP) and thus had no

---

**2.** These theories include breach of the implied warranty of habitability, breach of express and implied warranties, breach of contract, negligence, fraud, and violations of the Texas Residential Construction Liability Act and the Deceptive Trade Practices–Consumer Protection Act ("DTPA").

**3.** The first three objections argued Roe's late disclosures of witnesses and damage calculations and the failure of the parties to mediate prior to arbitration required a continuance.

personal liability. *See* TEX.REV.CIV. STAT. ANN. art. 6132b–3.07(a)(1) (Vernon Supp. 2009). When Metro LLP withdrew its registration, it converted to a limited partnership (Metro LP) as allowed by law, and Ladymon became a limited partner in Metro LP. Ladymon argued that the contracts and obligations of the old partnership were assigned to the new partnership by operation of law, and thus no formal assignment of Roe's contract to Metro LP was required. *See* TEX.REV.CIV. STAT. ANN. art. 6132b–9.05(h)(1)–(3) (Vernon Supp.2009). And, Ladymon argued, as a limited partner he had no personal liability for the partnership's obligations. *See* TEX.REV. CIV. STAT. ANN. art. 6132a–1, § 3.03(a), (b)(1) (Vernon Supp.2009).

Roe's post-hearing brief argued that, even though Ladymon did not sign the arbitration agreement in his individual capacity, he was bound to arbitrate the claims against him because he was an officer, agent, or representative of the entity that signed the agreement and was not a stranger to the contract. She also argued that because the contract provided it was binding upon the parties and "their respective ... representatives [and] successors ...," Ladymon was bound to arbitrate as a representative and successor to Metro LLP. Her successor liability argument was based on Ladymon's deposition testimony that, to his knowledge, when Metro LLP was "dissolved" there was no formal assignment of the contract with Roe, but he continued to do the work.

On June 5, 2007, the arbitrator signed an award. He overruled Ladymon's objections and ruled Metro LLP and Ladymon were jointly and severally liable for Roe's damages. Roe filed this suit to confirm the arbitration award. Metro LLP and Ladymon filed an answer and application to vacate the award.

After hearing evidence and argument, the trial court rendered final judgment. As to Ladymon, the judgment stated:

> Defendant Ladymon timely and properly objected to the arbitrator regarding the arbitrator's lack of jurisdiction over him in a personal capacity. Furthermore, whether or not Defendant Ladymon was personally liable for the debts of defendant [Metro LLP] is a separate issue from whether or not Defendant Ladymon was bound by the arbitration clause.

The trial court then held that the arbitrator exceeded his authority in rendering an award against Ladymon individually, stating: "The arbitrator was without jurisdiction and the determination of the arbitrator's jurisdiction is a matter of arbitrability under *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920 [131 L.Ed.2d 985] (1995) and is exclusively reserved to this Court."

As to Metro LLP, the court's judgment stated that the court was bound by the "exceedingly deferential standard of review that must be given to arbitral awards." It concluded that Metro LLP did not prove that it received a fundamentally unfair hearing based on the arbitrator's refusal to postpone the hearing or based on evident partiality of the arbitrator. Thus, the trial court confirmed the award against Metro LLP, but vacated the award against Ladymon individually.

Both Roe and Metro LLP appealed. Roe's brief identifies a single issue on appeal: whether the trial court erred in vacating the award against Ladymon individually. In its cross-appeal, Metro LLP asserts the trial court erred by confirming (and not vacating) the award against it.[4]

---

4. Metro LLP is named as an appellee and as the cross-appellant in its brief. The briefs of

## II. Roe's Appeal—Arbitrability of Claims Against Ladymon

Roe asserts the arbitrator did not exceed his authority by determining that her claims against Ladymon were subject to arbitration, and that the arbitrator's decision on that issue was correct. She asks this Court to reverse the trial court's judgment vacating the award against Ladymon and render judgment confirming the arbitration award against Ladymon.

### A. Applicable Law

#### 1. Introduction

■ We begin with the foundational principle that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns. Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).[5] The United States Supreme Court "has repeatedly emphasized that arbitration 'is a matter of consent, not coercion,' that the [FAA] 'does not require parties to arbitrate when they have not agreed to do so,' and its purpose is to make arbitration agreements 'as enforceable as other contracts, but not more so.'" *In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185, 192 (Tex.2007) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 293, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (also quoting *Volt,* 489 U.S. at 478, 109 S.Ct. 1248); and *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

■ A person seeking to compel arbitration must first establish the existence of an arbitration agreement subject to the FAA and show that the claims raised fall within the scope of that agreement. *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 737 (Tex.2005); *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 195 S.W.3d 807, 813 (Tex.App.-Dallas 2006, orig. proceeding). Here, the arbitration provision states it is governed by the FAA, and the parties agreed before the trial court and on appeal that the FAA applies. Thus, we conclude the FAA is applicable to this dispute. *See In re Kellogg Brown & Root,* 80 S.W.3d 611, 617 (Tex.App.-Houston [1st Dist.] 2002, orig. proceeding) (when parties agree to arbitrate under the FAA, they are not required to establish that the transaction at issue involves or affects interstate commerce). While Texas law governs procedural matters in state court cases regarding arbitration, the FAA, if applicable, controls the substantive grounds for vacating, modifying, or correcting an arbitration award. *See In re Chestnut Energy Partners, Inc.,* 300 S.W.3d 386, 399 (Tex.App.-Dallas 2009, pet. denied).

■ Disputes about the scope of an arbitration agreement are resolved in fa-

---

the parties refer to Metro LLP as the party to the arbitration award and the trial court's judgment. No party complains or suggests that Metro LP is the correct party.

**5.** Although we look to decisions of the lower federal courts and other state courts, only decisions of the United States Supreme Court, the Texas Supreme Court, and prior decisions of this Court are binding precedent. *See In re Morgan Stanley & Co.,* 293 S.W.3d 182, 189–

90 (Tex.2009); *Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993) ("While Texas courts may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision, they are *obligated* to follow only higher Texas courts and the United States Supreme Court.").

vor of arbitration. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 737. However, this presumption favoring arbitration "arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists." *Id.* (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex.2003)).[6]

■■■■ Like other contracts, nonparties are normally not bound by arbitration agreements between others. *See* 21 R. LORD, WILLISTON ON CONTRACTS § 57:19 (4th ed.2003). But just as other contracts can become binding on nonparties, principles of contract law and agency may bind a non-signatory to an arbitration agreement. Thus non-signatories to a contract containing an arbitration clause may be required to arbitrate if rules of law or equity would bind them to the contract generally. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex.2009); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 131 (Tex. 2005) ("Indeed, if Texas law would bind a nonparty to a contract generally, the FAA would appear to preempt an exception for arbitration clauses alone.").[7]

### 2. Who Primarily Decides Arbitrability?

■■■ The parties to this appeal disagree about a preliminary—but critical—question of law: who has the primary power to decide whether Ladymon is required to arbitrate—the arbitrator or a court? The answer determines the applicable standard of review: if the question is primarily for the arbitrator to decide, courts will review the arbitrator's determination of that issue with great deference, but if the question is primarily for the court to decide, courts will review the question independently or de novo. *See First Options*, 514 U.S. at 942, 115 S.Ct. 1920; *Perry Homes v. Cull*, 258 S.W.3d 580, 587 (Tex.2008) (courts conduct ordinary review of trial court's initial referral to arbitration and deferential review only of arbitrator's award); *J.M. Davidson, Inc.*, 128 S.W.3d at 227 ("The trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review.").

On appeal, Roe asserts both that the trial court incorrectly interpreted and applied *First Options*, and that a proper application of *First Options* would result in affirming the arbitration award against Ladymon. Roe also argues, apparently

---

**6.** As explained in *Marciano v. MONY Life Ins. Co.*, the presumption in favor of arbitration applies only to the *scope* of an open-ended arbitration agreement, never to the *existence* of such an agreement or to the *identity* [sic] the parties who might be bound by such an agreement. If *A* and *B* have an agreement to arbitrate any dispute that arises between them, there is a presumption that, if a dispute arises between them, the dispute is within the scope of the agreement. However, if a dispute arises between *A* and *C*, even if *B* and *C* are closely related, there is no "presumption" that *A* has agreed to arbitrate its dispute with *C*.
*Marciano v. MONY Life Ins. Co.*, 470 F.Supp.2d 518, 526, n. 12 (E.D.Pa.2007).

**7.** State law generally governs whether a person has agreed to arbitrate, and federal law governs the scope of the arbitration agreement. *Labatt*, 279 S.W.3d at 643. The question whether non-signatories are bound by an arbitration agreement is distinct and may involve either or both issues. *Id.* Although the Supreme Court has not directly addressed whether state or federal law governs, it recently spoke of the issue in purely state-law terms. *See Arthur Andersen LLP v. Carlisle*, —— U.S. ——, 129 S.Ct. 1896, 1902, 173 L.Ed.2d 832 (2009) (neither § 2 nor § 3 of the FAA "purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)"). Until the question is resolved, we are governed by the Texas Supreme Court's directive to apply "state substantive law and endeavor to keep it consistent with federal law." *Labatt*, 279 S.W.3d at 643.

alternatively, that *First Options* is distinguishable from this case. Because of its centrality to the issues and arguments before us, we discuss *First Options* in some length.

*First Options* involved an agreement between two companies—First Options and MK Investments, Inc. (MKI), a company wholly owned by Manuel Kaplan and his wife. Based on an arbitration clause in the contract, First Options demanded arbitration against MKI and Kaplan. MKI submitted to arbitration but the Kaplans filed an objection with the arbitration panel, denying their dispute with First Options was arbitrable. The arbitrators decided they had the power to rule on the dispute's merits and ruled in favor of First Options. The trial court confirmed the award but the court of appeals reversed, stating that courts should independently decide whether an arbitration panel has jurisdiction over a dispute. *First Options*, 514 U.S. at 940–41, 115 S.Ct. 1920.

The Supreme Court characterized the issue as a narrow one:

> To understand just how narrow, consider three types of disagreement present in this case. First, the Kaplans and First Options disagree about whether the Kaplans are personally liable for MKI's debt to First Options. That disagreement makes up the *merits* of the dispute. Second, they disagree about whether they agreed to arbitrate the merits. That disagreement is about the *arbitrability* of the dispute. Third, they disagree about *who should have the primary power* to decide the second matter. Does that power belong primarily to the arbitrators (because the court re-

views their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)? We consider here only this third question.

*Id.* at 942, 115 S.Ct. 1920 (emphases added).

We quote the above text to illustrate that, contrary to one of Roe's arguments, *First Options* is not distinguishable from this case in any meaningful way. This case presents the same three types of disagreements present in *First Options*. First, Roe and Ladymon disagree as to whether Ladymon is personally liable to Roe—the *merits* of Roe's claim. Second, they disagree about whether they agreed to arbitrate the merits—the *arbitrability* of the dispute. Third, they disagree about *who should have the primary power* to decide the second matter—the arbitrator or the courts. Indeed, this third issue is the subject of our current discussion.

In *First Options*, the Supreme Court observed that arbitration, being a matter of contract, is "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Id.* at 943, 115 S.Ct. 1920. The Court held that the "who decides" question of arbitrability also turns upon the agreement of the parties, and that "a court must defer to an arbitrator's arbitrability decision *when* the parties submitted that matter to arbitration." *Id.* (emphasis added).[8]

However, the Court went on to discuss *how* a court should decide whether the parties agreed to submit arbitrability to the arbitrator. The Court stated that, when deciding whether the parties agreed

---

8. The Court continued:

 If, on the other hand, the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide

 any other question that the parties did not submit to arbitration, namely, independently.

 *Id.* at 943, 115 S.Ct. 1920 (citations omitted).

to arbitrate a certain matter, courts should apply ordinary state-law principles governing the formation of contracts, with an important qualification

> applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability: Courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so.

*Id.* at 944, 115 S.Ct. 1920 (citing *AT & T,* 475 U.S. at 649, 106 S.Ct. 1415; *Warrior & Gulf Nav. Co.,* 363 U.S. at 583 n. 7, 80 S.Ct. 1347). The Court recognized this qualification reverses the presumption favoring arbitration with respect to "silence or ambiguity about '*who* (primarily) should decide arbitrability'...." *Id.* at 944–45, 115 S.Ct. 1920. But as the Court noted, this differing treatment is justified given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration. *Id.* at 945, 115 S.Ct. 1920.

Reviewing the record, the Court then concluded that First Options could not show that "the Kaplans clearly agreed to have the arbitrators decide (i.e. to arbitrate) the question of arbitrability." *Id.* at 946, 115 S.Ct. 1920. Therefore, the question of whether the Kaplans were required to arbitrate their dispute with First Options was "subject to independent review by the courts." *Id.* at 947, 115 S.Ct. 1920.

Seven years later, the Supreme Court reiterated that a "question of arbitrability" is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). In applying this interpretive rule, the Court in *Howsam* explained that not all "potentially dispositive gateway question[s]" constitute "questions of arbitrability." *Id.* It defined the latter phrase to encompass

> the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

*Id.* at 83–84, 123 S.Ct. 588. As examples of such "questions of arbitrability," the Court cited cases involving disputes about whether an arbitration contract bound parties who did not sign the agreement (*First Options,* 514 U.S. at 943–44, 115 S.Ct. 1920), whether an arbitration agreement survived a corporate merger and bound the resulting corporation (*John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964)), and whether an arbitration clause in a concededly binding contract applied to a particular type of controversy (*AT & T,* 475 U.S. at 651–52, 106 S.Ct. 1415). *See Howsam,* 537 U.S. at 84, 123 S.Ct. 588.[9]

Recently, the Supreme Court again confirmed that whether parties have agreed to submit a particular dispute to arbitration is an issue for judicial determination and that "where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* —— U.S. ——, 130 S.Ct. 2847, 2855–56, 177 L.Ed.2d 567

---

9. In contrast, the Court in *Howsam* noted that it had found the phrase "question of arbitrability" not applicable in other kinds of general, "procedural" circumstances where parties would likely expect that an arbitrator would decide the gateway matter. *See Howsam,* 537 U.S. at 84–85, 123 S.Ct. 588.

(2010);[10] *see also Rent–A–Center, W., Inc. v. Jackson,* —— U.S. ——, 130 S.Ct. 2772, 2777, 177 L.Ed.2d 403 (2010) (citing *First Options* for the principle that arbitration is a matter of contract).

The Texas Supreme Court has also stated that under the FAA, "[w]hether an arbitration agreement binds a non[-]signatory is a gateway matter to be determined by courts rather than arbitrators unless the parties clearly and unmistakably provide otherwise." *Labatt,* 279 S.W.3d at 643 (citing *In re Weekley Homes,* 180 S.W.3d at 130 and *Howsam,* 537 U.S. 79, 83–84, 123 S.Ct. 588 (2002)).

▉▉▉▉ We conclude that whether Roe can require Ladymon to arbitrate her claims against him individually is an "issue of arbitrability." *See Howsam,* 537 U.S. at 83, 123 S.Ct. 588. If the court determines that the parties "clearly and unmistakably agreed" to submit arbitrability to the arbitrator, it should defer to the arbitrator's decision on the issue. *See First Options,* 514 U.S. at 943, 115 S.Ct. 1920. However, absent "clear and unmistakable evidence" that the parties agreed to the contrary, the primary power to decide such issues lies with the courts—not an arbitrator. *See First Options,* 514 U.S. at 944, 115 S.Ct. 1920; *Howsam,* 537 U.S. at 84, 123 S.Ct. 588. Doing so "avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Howsam,* 537 U.S. at 83–84, 123 S.Ct. 588.

3. Whose Agreement Are We Looking For?

However, when looking for "clear and unmistakable evidence" that the parties agreed to arbitrate the issue of arbitrability, whose agreement are we looking for—that of the parties to the contract containing the arbitration clause or the would-be parties to the sought-for arbitration?

We find it significant that when the Supreme Court in *First Options* looked for clear evidence of an agreement to arbitrate arbitrability, it did not even address the terms of the arbitration agreement. In other words, the Court looked for "clear and unmistakable evidence" that *the parties to the dispute before the courts* (First Options and the Kaplans) agreed to arbitrate the issue of arbitrability, not the parties to the contract containing the arbitration clause (First Options and MKI). *See First Options,* 514 U.S. at 946–47, 115 S.Ct. 1920 (noting that First Options could not show *the Kaplans* clearly agreed to have the arbitrators decide arbitrability). This is understandable, as in *First Options* it was undisputed that the Kaplans were not parties to the agreement containing the arbitration clause.

▉▉▉▉ Moreover, when addressing whether a non-signatory to the arbitration agreement can be required to arbitrate, looking to the intent of the contracting parties on the issue of arbitrating arbitrability does not avoid the "risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Howsam,* 537 U.S. at 83–84, 123 S.Ct. 588.[11]

---

**10.** Quoting both *Volt* and *First Options,* the Court made clear that the federal policy favoring arbitration cannot be "divorced from the first principle that underscores all of our arbitration decisions: Arbitration is strictly 'a matter of consent,' and thus 'is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'" *Granite Rock,* 130 S.Ct. at 2857 (quoting *Volt,* 489 U.S. at 479, 109 S.Ct. 1248; *First Options,* 514 U.S. at 943, 115 S.Ct. 1920).

**11.** When a non-signatory resists arbitration, looking at what the signatories to the arbitration agreement said about arbitrability creates a "chicken and egg" situation:

But what if the challenge to the contract is that it never came into being? Since "arbitration is a matter of contract", the issue

Therefore, a court should decide whether an arbitration contract binds a person who did not sign the contract. *Id.* (citing *First Options*, 514 U.S. at 943–46, 115 S.Ct. 1920).[12]

 While non-signatories to an arbitration agreement can be bound to àrbitrate under principles of contract and agency law, such issues—dealing as they do with non-signatories—are gateway "issues of arbitrability" that the courts are primarily responsible for deciding—not the arbitrator. *See Howsam*, 537 U.S. at 84, 123 S.Ct. 588. And only if the non-signatory has "clearly and unmistakably agreed" to submit that issue to arbitration will the courts be bound to a deferential review of the arbitrator's decision that the non-signatory is bound by the arbitration agreement.

4. Is There "Clear and Unmistakable Evidence" Ladymon Agreed to Arbitrate Arbitrability?

Roe asserts there is clear and unmistakable evidence that Ladymon agreed to arbitrate whether he was bound by the arbitration agreement based on three arguments: (1) Ladymon actually signed the contract and is bound as a representative of Metro LLP; (2) the arbitration clause refers to the AAA rules and those rules allow the arbitrator to decide his own jurisdiction; and (3) Ladymon did not specifically object to the arbitrator's jurisdiction, he participated in the arbitration, and he invoked the power of the arbitrator by filing his objection.

### a. Did Ladymon Agree by Signing as a Partner of Metro LLP?

██ Roe argues Ladymon consented to arbitrate claims against him individually because he was "a signatory to the contract" and "a representative of Metro." Ladymon did sign the contract as a partner of Metro LLP[13] and initialed each page in the blank for "Contractor." However, the contract identifies the parties to the contract as Roe, the owner, and Metro LLP, the contractor; Ladymon individually is not identified as a party.

Moreover, Ladymon's signature on the contract does not render him personally a party to the contract because he clearly indicated he was signing on behalf of contractor, Metro LLP, and not on his own behalf. *See Eppler, Guerin & Turner, Inc. v. Kasmir*, 685 S.W.2d 737, 738 (Tex.

---

must be one for the court to decide. Otherwise, an arbitrator would be put in the position of deciding whether he was authorized to decide the parties' dispute, concluding either that he was not authorized, a logical circularity, or that he was, and raising himself by his own bootstraps. Thus, whether a person is bound by a contract he never signed is an issue for the court. *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 192–93 (Tex.2009) (Hecht, J., dissenting) (citations omitted); *see also* Dwayne E. Williams, *Binding Nonsignatories to Arbitration Agreements*, 25 Franchise L.J. 175, 182 (2006) (arguing the question is always for the courts to decide because the arbitrator cannot use the doctrines that may bind a non-signatory to an arbitration clause to bootstrap his own jurisdiction).

**12.** Thus, "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. Where a party contests either or both matters, 'the court' must resolve the disagreement." *Granite Rock*, 130 S.Ct. at 2857–58 (citing *First Options*, 514 U.S. at 943, 115 S.Ct. 1920).

**13.** The signature block for the contractor reads:

CONTRACTOR:
METRO TOWNHOMES & HOMES, L.L.P.
By: */s/ Blane Ladymon*
Printed Name: *Blane Ladymon*
Its: *Partner*

App.-Dallas 1985, writ ref'd n.r.e.) (an agent contracting for the benefit of a disclosed principal is not liable on the contract); *see also Fed. Deposit Ins. Co. v. K–D Leasing Co.*, 743 S.W.2d 774, 776 (Tex. App.-El Paso 1988, no writ) (agent's signature below principal's name preceded by preposition "by" indicated agent signed on behalf of disclosed principal only, and thus agent was not liable on contract); RESTATEMENT (SECOND) OF AGENCY § 320 (1958) ("Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.").[14]

Further, being a partner in a registered limited liability partnership, and thus its "representative," does not make the partner personally liable for the obligations of the limited liability partnership. TEX.REV. CIV. STAT. ANN. art. 6132b–3.08(a)(1) (Vernon Supp.2009) ("a partner in a registered limited liability partnership is not individually liable, directly or indirectly, by contribution, indemnity, or otherwise, for debts and obligations of the partnership incurred while the partnership is a registered limited liability partnership"). While an agent of a disclosed principal may agree to substitute his own responsibility for that of the principal or to add his responsibility to that of the principal, there is no indication

here that Ladymon did so merely by signing the contract as a partner of a limited liability partnership.[15]

Roe also asserts *First Options* is "completely distinguishable from the facts in this case because the parties opposing arbitration in *First Options* [the Kaplans] never signed the contract containing the arbitration clause, whereas ... Ladymon did sign the arbitration contract in this case." Roe appears to be incorrect; although not discussed by the Supreme Court's opinion, the court of appeals decision in *First Options* reveals that Kaplan (the president, a director, and sole shareholder of MKI) signed the original agreement containing the arbitration clause on behalf of MKI. *See Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1506–07 (3d Cir.1994), *aff'd*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).[16] In any event, Ladymon's signature in this case was only in his representative capacity and we see no distinction between *First Options* and this case on the basis of that signature.

We reject Roe's argument that Ladymon's execution of the document on behalf of Metro LLP is evidence that he clearly and unmistakably agreed the arbitrator could decide whether he is bound to arbitrate claims against him individually.

---

**14.** *See also Bel–Ray Co. v. Chemrite Ltd.*, 181 F.3d 435, 445 (3d Cir.1999) ("Generally, of course, an agent of a disclosed principal, even one who negotiates and signs a contract for her principal, does not become a party to the contract."); RESTATEMENT (SECOND) OF AGENCY § 156 & cmt. a (1958).

**15.** In support of her argument, Roe also relies on a provision in the Roe–Metro LLP contract stating that the contract was "binding upon and inure[s] to the benefit of the parties hereto and their respective ... representatives," but cites no authority that a general clause dealing with assignment of a contract alters

the liability of an agent for a disclosed principal. As discussed below, we do not see how this assignment language substitutes or adds the agent's (Ladymon's) personal responsibility to that of the principal (Metro LLP).

**16.** After later settlement negotiations, the Kaplans, MKI, and First Options signed four separate documents, only one of which contained an arbitration clause and only First Options, MKI and another entity signed that document. *Id.* Individually, the Kaplans signed only a letter agreement that did not include an arbitration clause. *Id.*

### b. Did Ladymon Agree Based on Roe's and Metro LLP's Agreement to Arbitrate Pursuant to the AAA Rules?

 Roe states that "the parties agreed that the AAA Construction Industry Rules governed the proceedings and Rule R–8 provides that the Arbitrator has the power and authority to arbitrate any jurisdictional issues—not the [c]ourts." However, as discussed above, the entities who agreed to arbitrate under the AAA rules are Metro LLP and Roe, not Ladymon. As was the case in *First Options*, the terms of the contracting parties' agreement to arbitrate is not evidence that a non—contracting party—here Ladymon—agreed to arbitrate or to do so under AAA rules, much less clear and unmistakable evidence of such an agreement. *See First Options*, 514 U.S. at 946–47, 115 S.Ct. 1920.

We cannot say that Ladymon clearly and unmistakably agreed to submit gateway issues to an arbitrator simply because Roe and Metro LLP agreed to arbitrate in accordance with rules selected by the AAA. Thus we reject Roe's argument that her agreement with Metro LLP to arbitrate in accordance with the AAA rules shows that Ladymon clearly and unmistakably agreed to submit the gateway issue to the arbitrator.

### c. Did Ladymon Waive by His Argument Before the Arbitrator?

 Roe also argues that by objecting to the arbitrator that he was not subject to arbitration, Ladymon waived any objection to the arbitrator deciding whether Ladymon was bound to arbitrate Roe's claims against him individually. She argues Ladymon's objection that he never signed an

arbitration agreement individually is not an objection to the arbitrator's authority to decide the dispute. We disagree. Ladymon's objection—that he never agreed to arbitrate disputes against him individually—is an objection that the arbitrator had no power to bind him to a resolution of those disputes.

Roe also argues Ladymon participated in the arbitration proceedings and actually invoked the arbitrator's power to decide the question of arbitrability by filing his objection requesting he be dismissed. The Supreme Court rejected such an argument in *First Options*, 514 U.S. at 946, 115 S.Ct. 1920 ("To the contrary, insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did *not* want the arbitrators to have binding authority over them."). Just as the Kaplans did not manifest an intent to be bound by the arbitrators' decision by filing a memorandum objection to the arbitrators' jurisdiction over them, so too Ladymon's submission of a written objection to the arbitrator's jurisdiction over him individually did not manifest an intention that he would be bound by the arbitrator's decision. This conclusion is supported by the obvious explanation for Ladymon's presence before the arbitrator (as a partner of Metro LLP) and because of authority like *First Options* that a person might argue arbitrability to the arbitrator without losing his right to independent court review. *Id.*

Roe's argument that Ladymon waived his objection to the arbitrator's power over him by objecting to the arbitrator is, of course, circular. It would be a harsh rule indeed to require a person to preserve an issue by arguing it to the arbitrator[17] and

---

17. *See, e.g., AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir.2000) ("If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the

at the same time conclude he waived the issue by making the objection. We conclude Ladymon, by objecting to the arbitrator's jurisdiction over him, did not thereby submit himself to the very jurisdiction he was challenging. *See First Options*, 514 U.S. at 946, 115 S.Ct. 1920. We reject Roe's waiver argument.

### d. Conclusion

Whether the arbitration agreement binds Ladymon as a non-signatory is for the courts to decide, unless there is "clear and mistakable evidence" that Ladymon agreed the arbitrator would make that decision. *See Howsam*, 537 U.S. at 84, 123 S.Ct. 588; *First Options*, 514 U.S. at 944, 115 S.Ct. 1920. On this record, Roe has not shown that Ladymon "clearly agreed to have the arbitrator[ ] decide (*i.e.*, to arbitrate) the question of arbitrability." *First Options*, 514 U.S. at 946, 115 S.Ct. 1920. Because the non-contracting party (here Ladymon) "did not clearly agree to submit the question of arbitrability to arbitration, the [district court] was correct in finding that the arbitrability of the [Ladymon/Roe] dispute was subject to independent review by the courts." *Id.* at 947, 115 S.Ct. 1920. Therefore, the trial court had the primary responsibility to decide the question of whether Ladymon is bound by the arbitration provision in Roe's contract with Metro LLP. Accordingly, the trial court correctly concluded the arbitrability of the Roe–Ladymon dispute was subject to its de novo determination, i.e. without deference to the arbitrator's prior decision on the issue.

### B. Did the Trial Court Correctly Determine Ladymon Was Not Bound by the Arbitration Agreement?

Having determined the courts have the primary power to decide the question, we turn to the correctness of the trial court's decision: can Ladymon, a nonparty to the arbitration agreement, be compelled to arbitrate the claims against him? For the same reasons discussed above, we review the trial court's decision de novo.[18]

As mentioned above, in some circumstances rules of contract law or agency can bind a nonparty to a contract, including an arbitration provision. *See In re Weekley Homes*, 180 S.W.3d at 129 ("both state and federal courts have recognized [that] nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally"); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 738.

We have addressed and rejected Roe's arguments that Ladymon is bound by the arbitration provision because he signed the agreement on behalf of Metro LLP and that he waived his objections to arbitrating

---

outcome and then later argue that the arbitrator lacked authority to decide the matter.... If, however, a party clearly and explicitly reserves the right to object to arbitrability, his participation in the arbitration does not preclude him from challenging the arbitrator's authority in court.") (citations omitted); *see also*, Tex. Civ. Prac. & Rem.Code Ann. § 171.088(a)(4) (Vernon 2005) (recognizing ground for vacating award for lack of an agreement to arbitrate where applicant raised objection in arbitration hearing). Because the FAA applies here, the Texas statutory grounds for vacating an arbitration award do not apply in this case. *See Chestnut Energy Partners*, 300 S.W.3d at 399.

**18.** *See Myer v. Americo Life, Inc.*, 232 S.W.3d 401, 407 (Tex.App.-Dallas 2007, no pet.); *see also First Options*, 514 U.S. at 947–48, 115 S.Ct. 1920 (noting that "courts of appeals should apply ordinary, not special, standards when reviewing district court decisions upholding arbitration awards"). The issues before us are legal questions reviewed de novo; the facts regarding whether Ladymon was bound by the arbitration agreement are undisputed.

the claims against him. Roe's remaining arguments are that the trial court erred by vacating the arbitrator's award against Ladymon because, even though he was a nonparty, he was bound to arbitrate her claims against him as a successor to Metro LLP and as an agent of Metro LLP under the rule in *In re Vesta Insurance Group, Inc.*, 192 S.W.3d 759 (Tex.2006) (per curiam).

1. Is Ladymon Bound as a Successor to Metro LLP?

 Roe argues that Ladymon consented to arbitrate her claims against him individually because he was "a successor" to Metro LLP, and that Paragraph 29(b)[19] of the contract (the "successors and assigns" clause) requires him to arbitrate even if he did not sign the contract individually. Such clauses generally speak to what happens when a party to the contract dies or ceases to exist as a legal entity. They make a contract expressly assignable and have the effect of making a successor or assignee obligated to perform the assignor's obligations without an express agreement of assumption.[20]

Roe's argument that Ladymon became a successor to Metro LLP is based on his deposition testimony that there was no formal assignment of the contract and he continued to complete the project after Metro LLP converted to Metro LP. However, we conclude the record does not support Roe's contention that Ladymon individually became a successor to Metro LLP after its conversion.

The partnership filings submitted to the arbitrator in Ladymon's post-hearing brief, and which are contained in the trial court's record, show that Metro LLP withdrew its registration as a limited liability partnership and the same day converted to a limited partnership, Metro LP, with Ladymon becoming a limited partner in that partnership. *See* Tex.Rev.Civ. Stat. Ann. art. 6132b–9.05. By partnership law, Metro LLP's obligations transferred to Metro LP as a result of this conversion. *Id.* art. 6132b–9.05(h)(3) ("all liabilities and obligations of the converting entity shall continue to be liabilities and obligations of the converted entity in its new organizational form without impairment or diminution by reason of the conversion"). Thus, notwithstanding Ladymon's lay opinions about the legal effect of the partnership filings, Metro LP—and not Ladymon—was the successor to Metro LLP's contract with Roe.[21]

As described above, Ladymon was not personally liable on Metro LLP's contract before its conversion to Metro LP,[22] nor was he after the conversion.[23] Thus, we

---

19. Paragraph 29(b), states: "This Contract shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, representatives, successors and assigns where permitted by this Contract."

20. *See Penick v. Eddleman*, 291 S.W. 194, 195 (Tex. Comm'n App.1927, judgm't adopted); *Kirby Lumber Co. v. R.L. Lumber Co.*, 279 S.W. 546, 549 (Tex.Civ.App.-Beaumont 1926, no writ); 6A C.J.S. *Assignments* § 34 (2004) ("Parties to a contract may also agree to make an otherwise unassignable contract assignable by inserting a provision to the effect that the contract binds the parties' successors and assigns."); 29 R. Lord, Williston on Contracts §§ 74:40, 74F:3 (4th ed.2003).

21. We reached the same conclusion in connection with another contract between Metro LLP and a different homeowner. *See In re Hawthorne Townhomes, L.P.*, 282 S.W.3d 131, 138–39 (Tex.App.-Dallas 2009, orig. proceeding) (concluding Metro LP was the successor to Metro LLP and bound by the arbitration provision in a contract with the homeowner signed by Ladymon on behalf of Metro LLP).

22. *See* Tex.Rev.Civ. Stat. Ann art. 6132b–3.08(a)(1).

23. Ladymon was not liable on that contract as a limited partner of Metro LP. *See* Tex.Rev. Civ. Stat. Ann. art. 6132a–1 § 3.03(a), (b)(1).

reject Roe's argument that Ladymon was bound to arbitrate the claims against him individually because he was a successor to Metro LLP.

#### 2. Is Ladymon Bound as Agent for Metro LLP?

■ Roe argues Ladymon must arbitrate the claims against him individually because he was an agent or representative of Metro LLP and "agents and representatives of parties to contracts containing arbitration clauses are properly bound to arbitrate with the entity that signed the agreement," citing *In re Vesta Insurance Group, Inc.*, 192 S.W.3d at 762–63.

■ *In re Vesta* involved a different situation than the one before us. There, a signatory to a contract containing an arbitration clause filed a tortious interference suit against non-signatory officers and agents of the other party to the contract. 192 S.W.3d at 762–63. The signatory plaintiff was resisting arbitration while the non-signatory defendants sought to hold the signatory plaintiff to abide by his agreement to arbitrate. *Id.* The court recognized that estoppel principles may require a nonparty to arbitrate if it seeks through its claim to obtain a direct benefit from the contract containing the arbitration clause.[24] *Id.* *In re Vesta* stands for the proposition that a signatory plaintiff cannot avoid its agreement to arbitrate disputes simply by bringing tortious interference claims against the officers, agents, or affiliates of the other signatory to the contract. *Id.* Here, the party resisting arbitration did not sign the agreement to arbitrate. Thus *In re Vesta* does not support the argument that Roe, a signatory, may force Ladymon, a non-signatory, to arbitrate against his will by claiming he is an agent or representative of Metro LLP.

The application of the estoppel theory is illustrated by *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003). In *Bridas*, the Fifth Circuit recognized that allowing non-signatories to invoke an arbitration provision against someone who signed the arbitration agreement prevents "a signatory from avoiding arbitration with a non[-]signatory when the issues the non[-]signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Id.* (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir.1995)). But "[b]ecause arbitration is guided by contract principles, the *reverse* is not also true: a signatory may not estop a non[-]signatory from avoiding arbitration regardless of how closely affiliated the non[-]signatory is with another signing party." *Id.* (quoting *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group L.L.C.*, 268 F.3d 58, 62 (2d Cir.2001)) (emphasis added); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 195 S.W.3d at 814–15.

This case presents the "reverse" situation referred to in *Bridas* and *MAG Portfolio*. Here, unlike *In re Vesta*, the non-signatory (Ladymon) does not want to arbitrate Roe's claims against him individually, and there is no evidence he agreed to do so. Nor is there any basis to "estop" him from refusing to arbitrate because he

---

24. This is referred to as "direct benefits estoppel." *See Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 195 S.W.3d at 816. Equitable estoppel will also estop a signatory plaintiff from refusing to arbitrate claims related to the contract containing an arbitration clause against non-signatory defendants. *Id.* at 814–

15 (discussing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir.2000)); *see also Meyer v. WMCO-GP, L.L.C.*, 211 S.W.3d 302, 304 (Tex.2006) ("A person who has agreed to arbitrate with one party may in some cases be required to arbitrate related disputes with others.").

never agreed to arbitrate.[25] As we discussed earlier, by signing the contract as an agent for a disclosed principal, Ladymon did not become personally bound by the terms of that contract, including the arbitration clause.[26]

### 3. Conclusion

 The purpose of the FAA is to put arbitration agreements on equal footing with other contracts, to make them "as enforceable as other contracts, but not more so." *Prima Paint Corp.*, 388 U.S. at 404 n. 12, 87 S.Ct. 1801. Because an agent for a disclosed principal is not liable on the principal's contract, concluding such an agent is bound by an arbitration clause in that contract when he would not be bound by other provisions would make arbitration agreements "easier to enforce than other contracts, contrary to the [Federal] Arbitration Act's purpose." *Merrill Lynch Trust*, 235 S.W.3d at 194 ("As other contracts do not become binding on nonparties due to concerted misconduct, allowing arbitration contracts to become binding on that basis would make them easier to enforce than other contracts, contrary to the Arbitration Act's purpose."); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d at 740.

We conclude the trial court correctly determined that the gateway issue of arbitrability was for the court to decide and that Ladymon is not individually bound by the arbitration provision in Metro LLP's contract with Roe. Thus, the arbitrator exceeded his power by entering an award against Ladymon jointly and severally with Metro LLP. *See* 9 U.S.C. § 10(a)(4) (court may make an order vacating an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made"). We overrule Roe's sole issue on appeal.

### III. Metro LLP's Cross–Appeal

We turn now to Metro LLP's cross-appeal. Metro LLP argues the trial court should have vacated the award because the arbitrator (1) refused to postpone the arbitration hearing after a showing of sufficient cause to do so, and (2) demonstrated evident partiality in favor of Roe.

### A. Applicable Law

 Under the FAA, we review the trial court's decision to confirm an arbitra-

---

25. We recognize that in *In re Hawthorne*, Ladymon was also a non-signatory defendant; there, however, he chose to arbitrate with an unwilling signatory, Branch. *In re Hawthorne*, 282 S.W.3d at 135. While a non-signatory defendant (like Ladymon) may "estop" a signatory plaintiff (like Branch) from avoiding arbitration of claims relating to the plaintiff's arbitration contract, a signatory plaintiff (like Roe) cannot "estop" a non-signatory defendant (like Ladymon) from resisting arbitration regardless of how closely related Ladymon is to the other signing party (Metro LLP). *See Merrill Lynch, Pierce, Fenner & Smith*, 195 S.W.3d at 815. A person may not, of course, gamble on the outcome of litigation or arbitration and then switch to the other forum. *See AGCO Corp.*, 216 F.3d at 593; *Perry Homes*, 258 S.W.3d at 600. At least where a nonparty, like Ladymon, objects that he never signed an agreement to arbi-

trate, we see no legal rule preventing him from choosing litigation in this case simply because he chose arbitration in another case under a different contract with a different party. Therefore, our holding in *In re Hawthorne* is not inconsistent with our holding here. Moreover, the arbitration provision in *Hawthorne* was quite different from the provision here and expressly included disputes between the purchaser and the builder and their "representatives, employees, subcontractors, independent contractors, or agents." *Hawthorne*, 282 S.W.3d at 136, 139.

26. *See Flink v. Carlson*, 856 F.2d 44, 46 (8th Cir.1988) ("Signing an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally.").

tion award de novo. *See Myer*, 232 S.W.3d at 407. Our review of the award itself, however, is exceedingly deferential and narrow. *See id.; see also Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir.1994). An arbitration award must be confirmed unless it is vacated, modified, or corrected under one of the limited grounds in sections 10 and 11 of the FAA. *See* 9 U.S.C. §§ 9–11; *see also Roehrs v. FSI Holdings, Inc.*, 246 S.W.3d 796, 805–06 (Tex.App.-Dallas 2008, pet. denied).

■ The arbitrator's misconduct in refusing to postpone the arbitration hearing after a showing of sufficient cause is one ground for vacating an arbitration award. 9 U.S.C. § 10(a)(3). However, because the purpose of the policy favoring arbitration is to promote expeditious resolution of disputes, "a court's review of the arbitrator's decision to postpone or not postpone the hearing is quite limited." *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir.1995). An award may also be vacated for "evident partiality" of the arbitrator. 9 U.S.C. § 10(a)(2).

## B. Analysis

Metro LLP argues Roe disclosed her witnesses and documents long after the dates set in the original scheduling order. It contends the untimely disclosures prevented it from adequately preparing for the hearing. The scheduling order required Roe to disclose her witnesses and documents two weeks before the February hearing date. The hearing was later reset to May 7, and Roe served her disclosure two weeks before the May hearing. She also filed a supplemental disclosure on May 4, listing a new expert witness and additional documents supporting her claims. The arbitrator denied Metro LLP's written objections and request for a continuance based on the nature of the alleged construction defects disclosed in Roe's June 14, 2006 demand letter, the findings of the TRCC inspection report in October 2006, the hearing had been continued once already, and Metro LLP had ample opportunity to hire an attorney and prepare a response to Roe's claims.

Metro LLP argues the arbitrator's evident partiality was shown by his denying the continuance, and by his comment during a break that Metro LLP needed to finish presenting its evidence and set a post-hearing briefing schedule so that he could "finally get this lady some relief."

The trial court stated Metro LLP had raised serious concerns about the fairness of the arbitration proceedings, but recognized that parties to an arbitration agreement knowingly give up the procedural protections of the court system. *See Raiford v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 1410, 1413 (11th Cir.1990) ("When the parties agreed to submit to arbitration, they also agreed to accept whatever reasonable uncertainties might arise from the process."). Reviewing the limited record before the court and applying the deferential standard, the trial court concluded Metro LLP had not met its high burden to show the arbitrator committed misconduct in denying the continuance or engaged in evident partiality.

■ We have reviewed the record and the trial court's decision and reach the same conclusion. Metro LLP does not identify what evidence it could have obtained had it been granted a continuance and how it was prejudiced by the denial of the continuance. *See Laws v. Morgan Stanley Dean Witter*, 452 F.3d 398, 400 (5th Cir.2006) ("Absent even a representation that the materials produced on the eve of arbitration were important to his case or that a continuance might have altered the outcome of the arbitration, we cannot conclude that Laws was deprived of a fair hearing."). Nor does the arbitrator's

statement on this limited record rise to the level of evident partiality required to vacate the award. *See Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225, 234 (Tex.App.-Houston [14th Dist.] 1993, writ denied) (" 'Evident partiality' within the meaning of section 10(a)(2) means more than mere appearance of bias.").

 Finally, Metro LLP argues the award should be modified to eliminate a double recovery of damages. *See* 9 U.S.C. § 11. While the award appears to include damages for both "loss of use" of the property during repairs and "alternative housing," on this limited record and given the conflicting evidence presented to the arbitrator, we cannot say the award includes a material miscalculation of figures or a mistake warranting modification of the award. The award indicates these damages reflect the mortgage payments for six months and rental cost of alternative housing for that period. An arbitrator has broad discretion in fashioning a remedy appropriate to the case. *See Am. Laser Vision v. The Laser Vision Inst., L.L.C.,* 487 F.3d 255, 258–59 (5th Cir.2007), *abrogated on other grounds by Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008). Accordingly, we reject Metro LLP's sole issue on its cross-appeal.

## IV. Conclusion

We have overruled the sole issue presented in Roe's appeal and Metro LLP's cross-appeal. Accordingly, we affirm the trial court's judgment.