**AFFIRMED; Opinion Filed December 4, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00130-CV

**TECORE, INC., Appellant**
**V.**
**AIRWALK COMMUNICATIONS, INC., Appellee**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 11-03801-E**

## OPINION

Before Justices Fillmore, Myers, and Lewis
Opinion by Justice Myers

Tecore, Inc. appeals the trial court's judgment confirming an arbitration award in favor of AirWalk Communications, Inc. Tecore brings three issues on appeal contending (1) the trial court erred by finding Tecore submitted its jurisdictional objection to the American Arbitration Association and to the appointed arbitrator; (2) the trial court erred by determining there was an arbitration agreement and that the parties' claims fell within the scope of that agreement; and (3) the parties' contract is ambiguous regarding whether the parties intended to include an arbitration clause. We affirm the trial court's judgment.

## BACKGROUND

Tecore manufactures cellular networks using equipment provided by other companies, including AirWalk. Tecore would purchase equipment from AirWalk, integrate the equipment into its products, and sell those products to its customers.

On January 26, 2005, Tecore and AirWalk entered into the Distribution and Services Agreement, or DSA,[1] which governed AirWalk's relationship with Tecore as an integrator and reseller of AirWalk's products. The DSA contained no mention of arbitration. The DSA's term was four years and would renew automatically for one-year periods unless one party notified the other party in writing of its intent not to renew at least 180 days before the expiration of the term. If the term was not renewed, the DSA provided that certain terms would survive termination.

On July 29, 2008, AirWalk notified Tecore by letter that it would not renew the DSA when it expired on January 26, 2009. In the letter, AirWalk stated it wanted to enter into a new agreement with Tecore, and AirWalk attached a proposed DSA to the letter. AirWalk also stated, "In the meantime, and until a new agreement is in place, we intend to honor the terms of the current Agreements."[2] AirWalk's proposed DSA included an arbitration provision.

The parties continued to negotiate a new DSA, but never reached an agreement. AirWalk insisted that the new DSA be based on the proposed DSA AirWalk sent Tecore in July 2008, while Tecore insisted that the parties renew the existing DSA with only minor changes. January 26, 2009 came and went without the parties reaching a new agreement.

In June 2009, Tecore told AirWalk it wanted to purchase some of AirWalk's products for resale to a government program. David Oberholzer, one of AirWalk's vice presidents, met with Tecore's chief financial officer, Joe Gerrity, to discuss a new DSA for the transaction. According to an e-mail from Oberholzer to AirWalk's president, Oberholzer told Gerrity that AirWalk would like for Tecore to resell AirWalk's products, but only under the terms and conditions of the July 2008 proposed DSA. Oberholzer also said AirWalk was open to some

---

[1] Besides "DSA," the parties also referred to the agreement as the "Distribution Agreement," the "DA," and the "OEM Agreement." "OEM" stands for Original Equipment Manufacturer.

[2] Besides the DSA with Tecore, AirWalk had a separate DSA with a Tecore affiliate, TECORE Wireless Systems FZLLC (TWS) which expired in April 2009. This is why AirWalk's letter refers to "Agreements." TWS is not a party in this appeal.

–2–

modifications of the proposed DSA, but "if Tecore cannot work from the new DA document then we have no way to sell Tecore our products for resale."

On June 30, 2009, AirWalk sent Tecore a quotation of $471,000 for the products Tecore wanted to purchase. The quotation contained a price sheet that also listed seven numbered terms and conditions and stated the quotation was "subject to the following terms and conditions and as provided in Exhibit A attached hereto, the terms of which are incorporated herein." The first numbered term and condition on the price-sheet page stated that "Buyer will place a purchase order . . . which references the Quotation Number provided above and the terms and conditions contained herein." Exhibit A to the quotation was styled "AirWalk Communications, Inc. Terms and Conditions of Sale." Section 7(d) of Exhibit A contained an arbitration provision:

> (d) <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by and construed under the laws of the State of Texas, U.S.A. *Any dispute or claim arising out of or relating to this Agreement, or the breach hereof, shall be settled in Dallas, Texas by arbitration* administered by the American Arbitration Association, in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s), including attorneys' fees and costs of arbitration, may be entered in any court having jurisdiction thereof.

(Emphasis added.) The next day, July 1, 2009, Tecore sent AirWalk a purchase order; the purchase order referenced the quotation number but did not mention the terms and conditions. Tecore submitted revised purchase orders in July and early August that also referenced the quotation number. All purchase orders were signed by Gerrity for Tecore. In August, AirWalk sent Tecore its "Purchase Order Acceptance," which stated, "Terms and conditions of sale are per AirWalk Communications, Inc. Standard Terms and Conditions of Sale unless otherwise agreed to in writing." The purchase order acceptance was signed by a vice president for AirWalk.

Subsequently, problems arose concerning the timeliness of AirWalk's delivery of its products, the quality of its products, and Tecore's payment of the purchase price for the products.

AirWalk filed a demand for arbitration with the American Arbitration Association (AAA). Tecore then filed its "Answering Statement and Demand for Termination." Tecore requested that the AAA immediately determine whether there was jurisdiction for the arbitration before it appointed an arbitrator. In the alternative, Tecore requested that any arbitrator appointed to the case "address the issue of jurisdiction as a preliminary matter." The AAA declined to rule on the jurisdictional objection and appointed an arbitrator to hear the case.

The arbitrator held a hearing on Tecore's jurisdictional objections and found the disputes were "subject to binding arbitration pursuant to AAA Rules and Texas law" and that AAA and the arbitrator had jurisdiction over the arbitration. The case proceeded to a hearing before the arbitrator, with Tecore repeatedly objecting to the jurisdiction. The arbitrator heard the parties' evidence and argument. On March 18, 2011, the arbitrator issued the Final Award, which ruled in favor of AirWalk on its breach of contract claim and determined that "[t]he Distribution Agreements at issue were properly terminated by AirWalk and expired in accordance with their respective provisions." The arbitrator awarded AirWalk $285,181.25 in damages, $199,321 in attorney's fees, and $6183.64 in costs.

The parties then filed cross-petitions in state district court in Dallas County for confirmation and for vacation of the arbitrator's award. After hearing the parties' evidence and argument, the trial court granted AirWalk's motion to confirm the arbitration award, denied Tecore's motion to vacate the award, and entered judgment on the arbitration award. The court also made findings of fact in support of these rulings. In the findings, the court determined that Tecore had submitted the jurisdictional issue of arbitrability to the AAA and the arbitrator and that the arbitrator did not exceed her authority by determining the arbitrability of the claims and overruling Tecore's objection. The court also found in the alternative that if Tecore did not

submit the arbitrability issue to the arbitrator, then the parties contract included an arbitration provision.

## ARBITRATION

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  Ordinary principles of contract law determine whether there is a valid agreement to arbitrate.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005) (orig. proceeding).  The United States Supreme Court "has repeatedly emphasized that arbitration 'is a matter of consent, not coercion,' that the [Federal Arbitration] Act 'does not require parties to arbitrate when they have not agreed to do so,' and its purpose is to make arbitration agreements 'as enforceable as other contracts, but not more so.'"  *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 192 (Tex. 2007) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

A person seeking to compel arbitration must first establish the existence of an arbitration agreement subject to the Federal Arbitration Act and show that the claims raised fall within the scope of that agreement.  *In re Kellogg*, 166 S.W.3d at 737; *Roe v. Ladymon*, 318 S.W.3d 502, 510 (Tex. App.—Dallas 2010, no pet.).  Disputes concerning the scope of an arbitration agreement are resolved in favor of arbitration.  *In re Kellogg*, 166 S.W.3d at 737.  However, the presumption favoring arbitration "arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists."  *Id.* (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003)).

When construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam); *J.M. Davidson*, 128 S.W.3d at 229. When the provisions of a contract appear to conflict, we will attempt to harmonize the provisions and assume the parties intended every provision to have some effect. *See United Protective Servs., Inc. v. West Village Ltd. P'ship*, 180 S.W.3d 430, 432 (Tex. App.—Dallas 2005, no pet.). In doing so, however, we need not embrace strained rules of interpretation in order to avoid ambiguity at all costs. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).

## ARBITRABILITY OF ARBITRABILITY

In its first issue, Tecore contends the trial court erred by finding Tecore submitted its jurisdictional objection to arbitration to the AAA and the arbitrator. Whether the arbitrator or the trial court should have determined whether the parties' contract included an agreement to arbitrate their dispute affects the standard of review. If the question was for the arbitrator to decide, then the courts review that issue with great deference; otherwise, the courts make an independent or de novo determination of whether the parties agreed to arbitrate their dispute. *See First Options*, 514 U.S. at 942; *Perry Homes v. Cull*, 258 S.W.3d 580, 587 (Tex. 2008); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003).

In this case, the trial court first determined that the arbitrator correctly determined that the parties had agreed to submit to the arbitrator the issue of whether the contract contained an arbitration clause. The court then stated in the alternative that if the parties had not agreed to submit the arbitrability of the dispute to the arbitrator, that the court had conducted an

independent review of the existence of an arbitration agreement and had determined that the arbitration provision in Exhibit A of the quotation was part of the parties' contract.

We do not reverse a case unless the trial court's error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1). Because the trial court conducted an independent review of whether the parties' contract included an arbitration provision, any error from the trial court's initial determination that the parties agreed to arbitrate that issue could not have resulted in the rendition of an improper judgment. Accordingly, we do not consider whether the parties agreed to submit the arbitrability of their dispute to the arbitrator. Instead we consider whether the trial court correctly determined in its independent review of the case that the parties' contract contained an arbitration provision.

## WHETHER THE PARTIES AGREED TO ARBITRATE

In its second and third issues, Tecore contends the trial court erred by determining that the parties' contract included an agreement to arbitrate this dispute and erred by determining the agreement was not ambiguous.

Tecore asserts that the DSA did not expire, or if it did, then certain provisions survived the termination that precluded the arbitration provision in Exhibit A of the quotation. Tecore also argues that the arbitration provision in Exhibit A was not incorporated into the parties' contract.

The trial court found that the parties' contract was formed by AirWalk's quotation, Tecore's purchase order, and AirWalk's purchase order acceptance. The court also found that the contract included the arbitration provision in Exhibit A of the quotation, which required the parties to arbitrate their disputes pursuant to the AAA's rules.

**Letter of Intent to Terminate**

Tecore first argues that the DSA did not terminate and that its terms and lack of an arbitration provision applied to this transaction. The DSA's initial term was through January 26, 2009 and would renew automatically unless one party notified the other party in writing at least 180 days before the expiration of the term of the intent not to renew. On July 29, 2008, with at least 180 days left in the term, AirWalk, through its president, Serge Pequeux, notified Tecore and its president, Jay Salkini, "of our intent not to renew the TECORE Distribution Agreement . . . upon the expiration of the current term of [the] Agreement; specifically, January 26, 2009 for the TECORE Distribution Agreement . . . ." The termination letter stated,

> Dear Jay:
>
> Pursuant to Section 6.1 of the above referenced Agreements, AirWalk Communications, Inc. ("AirWalk", "we", "our" or the "Company") is hereby notifying you of our intent not to renew the TECORE Distribution Agreement or the TWS Distribution Agreement upon the expiration of the current term of each Agreement; specifically, January 26, 2009 for the TECORE Distribution Agreement and April 27, 2009 for the TWS Distribution Agreement.
>
> While it is our intent not to renew the currently effective Agreements, is it [sic] our hope and intent to enter into a new, single agreement with TECORE and TWS on terms acceptable to all parties. To that end, included with this letter for your review is a form of Distribution and Services Agreement we propose to enter into with TECORE and TWS. *In the meantime and until a new agreement is in place, we intend to honor the terms of the current Agreements.*
>
> Jay, thank you again for your support of AirWalk. I look forward to speaking with you at your earliest opportunity in regard to this matter.
>
> Sincerely,
> AirWalk Communications, Inc.
>
> /s/ S P Pequeux
> Serge Pequeux
> President, Chief Executive Officer

(Emphasis added.)

The parties disagree about the meaning of the italicized sentence, "In the meantime and until a new agreement is in place, we intend to honor the terms of the current Agreements." Tecore argues that AirWalk's statement that it intended "to honor the terms of the current Agreements" until a new agreement was in place meant that the DSA would remain in effect "until a new agreement is in place." Under Tecore's argument, the DSA did not expire on January 26, 2009 because a new agreement was not in place. Instead, Tecore argues, the DSA continued in effect through the sale of the goods in this case.

This argument isolates the italicized sentence and does not consider the effect of the rest of the document. Tecore's interpretation of the document goes against its stated purpose, "notifying you of our intent not to renew the TECORE Distribution Agreement . . . upon the expiration of the current term," and leaves that sentence without meaning. The document was intended to notify Tecore (1) that the DSA would not be renewed when it expired in 180 days and (2) that AirWalk wanted to enter into a new DSA with Tecore. In context, the statement "[i]n the meantime and until a new agreement is in place, we intend to honor the terms of the current Agreements," meant that AirWalk would continue to honor the terms of the DSA through its expiration date. If, as Tecore argues, AirWalk had intended for the DSA to remain in effect between January 26, 2009 and the date the parties executed a substitute DSA, there would have been no need for AirWalk to send a letter of notification of intent not to renew. If, during the six months remaining in the DSA, the parties had negotiated a new agreement, then that agreement could have provided for immediate termination of the original DSA; and if a new agreement was not reached before January 26, 2009, then the DSA would have been automatically renewed by AirWalk *not* sending the letter. The only reason for AirWalk to send notice of intent not to renew was if AirWalk intended for the DSA to expire if the parties did not reach a new agreement before January 26, 2009. We conclude the trial court did not err by determining the

–9–

"In the meantime" sentence in the July 29, 2008 letter did not extend the DSA through the sale in this case.

### The "Survival of Certain Terms" Provision of the DSA

Tecore argues that even if the DSA expired on January 26, 2009, certain provisions of the DSA survived, including the "General Provisions," which did not contain an arbitration provision.

Section 6.4 of the DSA provided,

> 6.4 <u>Survival of Certain Terms</u>. *Notwithstanding any termination of this Agreement, the following provisions shall survive*: Section 3.5 (Payments to AirWalk), 5 (Support and Maintenance), 6.4 (No Liability for Termination), 7 (Limitation of Liability), 8 (Proprietary Rights), 9 (Confidentiality), 11 (Representations and Warranties), 12 (Indemnity) and *13 (General Provisions).* All other rights, obligations, and licenses set forth herein shall cease upon expiration or termination of this Agreement for any reason.

(Emphasis added.) Section 13.6 of the "General Provisions" stated,

> 13.6. <u>Entire Agreement</u>. This Agreement, including the exhibits attached hereto, sets forth the entire agreement and understanding of the parties relating to the subject matter hereof and merges all prior discussion between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless set forth in writing signed by officers of both parties. *This Agreement supersedes any conflicting terms and conditions on any work orders, invoices, checks, order acknowledgements, forms, purchase orders, or other similar commercial documents relating hereto and which may be issued by a party after the Effective Date.*

(Emphasis added.) It appears Tecore is arguing that, despite the termination provisions, because section 13.6 survived termination and provided that the DSA superseded all conflicting terms in other documents, the terms of the DSA would continue to apply to any Tecore order from AirWalk for the purpose of resale. Thus, under Tecore's argument, any conflicting provisions in

–10–

the "commercial documents"—such as the terms and conditions attached to the quotation—would be superseded by the DSA.[3]

We disagree. Tecore's argument is based on the wording of section 6.4 and 13.6 in isolation from the rest of the DSA. Examination of the whole of the agreement shows that in section 2.1, AirWalk appointed Tecore as a non-exclusive distributor and integrator of AirWalk's products, "[s]ubject to the terms and conditions of this Agreement." The remainder of the DSA discusses the rights and duties of AirWalk and Tecore. Section 2.1 shows Tecore's rights and AirWalk's duties to Tecore under the DSA concerned Tecore as an appointed distributor and integrator. Section 2.1 was not one of the provisions that survived termination under section 6.4. After January 26, 2009, Tecore ceased to be an appointed distributor and integrator. Therefore, the provisions of the DSA surviving termination applied to any purchases, sales, or other activities governed by the DSA while Tecore was an appointed distributor and integrator, but they did not apply to any purchases, sales, or other transactions entered into after termination of the DSA on January 26, 2009. Tecore's inquiry and purchase order in this case was more than four months after Tecore ceased to be an appointed distributor and integrator. Accordingly, none of the DSA's provisions applied to the transaction in this case.

Tecore also argues that New York case law[4] shows the DSA applied to the sale in this case. In *Cammack v. J.B. Slattery & Bros.*, 148 N.E. 781 (N.Y. 1925), Cammack designed a radiator. Slattery agreed to sell radiators of Cammack's design and to hire Cammack as a sales manager for selling the radiators. The parties' agreement consisted of two parts. In the first part, Slattery agreed to pay Cammack a royalty for each radiator of his design it sold. In the second

---

[3] Tecore's argument suggests that the arbitration provision in Exhibit A of the quotation is a conflicting term, but Tecore cites no authority for that proposition. We make no determination in this opinion whether the arbitration provision in Exhibit A of the quotation conflicted with the DSA's lack of an arbitration provision.

[4] The general provisions of the DSA provided that the agreement was "governed and construed under the law of the State of New York."

part, Slattery agreed to pay Cammack a commission for the radiators sold through his work as sales manager. The contract also provided that if Cammack should "'discontinue or retire from the sale' of radiators," his commissions as sales manager would stop but he would continue to receive royalties. *Id.* The agreement had no termination date for the payment of royalties. *Id.* at 782. Five years into the agreement, Cammack ceased his duties as sales manager and disappeared to a health spa "in an endeavor to overcome the habit of the excessive use of alcoholic liquors, and to cure himself of the effects thereof." *Id.* Cammack never returned to Slattery. The following year, Slattery sent notices of termination of the contract to Cammack. *Id.* at 781. However, Slattery continued to sell the radiators Cammack designed. *Id.* at 781–82. Cammack brought suit for the commissions and royalties under the contract. The New York Court of Appeals concluded Slattery had the right under the contract to terminate the payment of commissions because Cammack "abandoned his place of business and thenceforth constantly remained away therefrom, the method of his going and staying away being so successful that [Slattery] did not even know where he was." *Id.* at 783. However, despite the notice of termination of the agreement, Slattery continued to sell the Cammack-designed radiator, and it remained obligated to pay Cammack royalties for the sale of those radiators. *Id.* at 782.

*Cammack* does not apply to this case. Here, there is no open-ended agreement as there was in *Cammack*, and no property right in the continuation of certain contract terms as in *Cammack*. Tecore argues *Cammack* shows that an agreement can remain in effect even after notice of termination. Slattery's termination of the contract could have ended its duty to pay royalties by terminating its obligation under the contract to manufacture and sell the Cammack-designed radiators. *Cammack*, 145 N.E. at 782. Because the contract provided Slattery would continue to pay royalties to Cammack after he ceased to be sales manager, Slattery denied Cammack his property right to royalties by selling his radiator without paying him. In this case,

–12–

there is no such property right. AirWalk had the right to terminate the DSA at the end of the term, but Tecore had no right analogous to Cammack's royalties property right to have the terms of the DSA apply to subsequent purchases from AirWalk after the termination of the DSA. We conclude *Cammack* is not applicable to this case.

### Whether AirWalk Required a DSA to Sell to Tecore

Tecore argues that notwithstanding the termination of the DSA, the agreement had to apply because AirWalk required that there be a reselling agreement like the DSA in place for customers like Tecore acting as resellers. Even assuming AirWalk had such a mandatory rule for which no exception was possible, Tecore does not explain what AirWalk's requirements for a reselling agreement were or why the terms and conditions attached to the quotation failed to meet those requirements. Nothing in the terms and conditions attached to the quotation prohibited Tecore from reselling the goods, and section 7(*l*) of the quotation's terms and conditions acknowledged that the goods might be part of a government contract.[5]

We conclude the DSA expired on January 26, 2009 and did not apply to the parties' contract.

### Existence of an Arbitration Provision in the Parties' Contract

Having determined that the DSA did not apply to the transaction in this case, we consider whether AirWalk proved the existence of an arbitration provision in the parties' contract.

#### A.    Tecore's Intent

Tecore states in its brief that the only evidence of Tecore's intent was the testimony of Joe Gerrity, "who testified that Tecore did not intend to agree to an arbitration provision, and that Tecore was not aware that AirWalk was attempting to include an arbitration provision by

---

[5] Section 7(*l*) provided: "If this Agreement is issued for any purpose that is either directly or indirectly connected with the performance of a prime contract with the government or a subcontract thereunder, the terms that the Armed Services Procurement Regulation or other appropriate regulations require to be inserted in contracts or subcontracts will be deemed to apply hereto."

–13–

attaching Quote # 501-06302009, the Price Sheet, and Exhibit A to Purchase Order 11810."

Tecore then cites to four places in Gerrity's deposition in support of this statement. None of the

cited pages to Gerrity's deposition supports this statement.[6] To the extent Tecore argues it was

unaware that Exhibit A contained an arbitration provision, reasonable diligence required

Tecore's executives to read the documents that contained the details of the offer Tecore accepted

when it issued the purchase order. *See Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d

404, 410 (5th Cir. 1998) ("Before he invested over two and one-half million dollars, reasonable

diligence required him to read the only documents that contained the details of the offer he

accepted when he purchased the Fund Units."); *cf. Dunmore v. Chi. Title Ins. Co.*, 400 S.W.3d

635, 642 (Tex. App.—Dallas 2013, no pet.) (parties presumed to have consented to terms in

documents they signed and are charged with knowledge of the legal effects of the documents).

Tecore also argues the quotation gave instructions for how acceptance must occur:

submission of a purchase order referencing the quotation number and the terms and conditions.

Tecore argues that because its purchase order did not reference the terms and conditions, its

acceptance through the purchase order without referencing the terms and conditions was actually

a rejection of the offer and no contract was formed. When an offer is conditioned upon a

specific form of acceptance, the acceptance must occur in that form or the offer is rejected.

*Massey v. Galvan*, 822 S.W.2d 309, 313 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

The Restatement (Second) of Contracts states,

> If an offer prescribes the place, time or manner of acceptance its terms in this
> respect must be complied with in order to create a contract. If an offer merely
> suggests a permitted place, time or manner of acceptance, another method of
> acceptance is not precluded.

---

[6] Tecore cites to pages 9, 122, 156–57, and 160 of Gerrity's deposition. On page 9, Gerrity discusses his professional background, identifying his current position with Tecore, and explaining what Tecore does. On the remaining pages Tecore cites, Gerrity discusses which of the purchase orders submitted by Tecore became part of the contract. Also, on page 160, AirWalk's counsel said none of the purchase orders mention the DSA, and Gerrity answered, "Nor does it say anything about the quotation Ts and Cs." Nowhere on these pages does Gerrity mention arbitration or state that Tecore was unaware of the arbitration provision.

RESTATEMENT (SECOND) OF CONTRACTS § 60.

For example, in a case cited by Tecore, *Town of Lindsay v. Cooke County Electric Co-operative Ass'n*, the town passed an ordinance offering the utility a fifty-year franchise. *Town of Lindsay*, 502 S.W.2d 117, 117 (Tex. 1973). The ordinance required "written acceptance of this franchise within thirty (30) days after the passage of this ordinance." *Id.* at 117–18. The utility did not file its written acceptance but did pay its gross receipts tax. *Id.* at 118. A few months later, the town repealed the ordinance offering the franchise, refunded the tax payment to the utility, and when the statutory period for a utility to operate without a franchise expired, the town ordered the utility to remove its poles and lines. *Id.* The utility argued it had accepted the franchise offer and had a fifty-year franchise. The supreme court stated,

> Where, as here, an offer prescribes the time and manner of acceptance, its terms in this respect must be complied with to create a contract. The use of a different method of acceptance by the offeree will not be effectual *unless the original offeror thereafter manifests his assent to the other party.* . . . If the manner of acceptance had not been specified in the ordinance, respondent's act in paying the gross receipts tax might constitute an implied acceptance of the franchise. Its conduct in this respect was not, however, a written acceptance within the meaning of the ordinance, and the record does not suggest that petitioner assented to an implied acceptance.

*Id.* (citations omitted) (emphasis added). *Town of Lindsay* is distinguishable for two reasons. First, we do not read the quotation in this case as calling for a specific form of acceptance. It appears to be a suggested acceptable method of acceptance but not a mandatory requirement for formation of the contract. *See Massey*, 822 S.W.2d at 314; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 60. Second, even if the quotation did specify the form that acceptance must take, the supreme court stated that the noncompliant acceptance can form the contract if the offeror "thereafter manifests his assent to the other party." *Town of Lindsay*, 502 S.W.2d at 118. In this case, AirWalk manifested its assent to Tecore by sending the purchase order acceptance.

–15–

Tecore cites to Joe Gerrity's testimony that the quotation, and apparently all of the documents that the trial court found formed the contract, were not part of the parties' contract. Gerrity stated AirWalk's quotation

> was an after-the-fact document. . . . The actual negotiation was between [AirWalk's president] and myself and this [the quotation] was just a follow-up document after the agreement had been reached. . . . The actual negotiation was not on a quotation basis. This was just a follow-up after the negotiation.

Gerrity's testimony shows the parties may have reached a preliminary agreement before AirWalk sent the quotation. However, the preliminary agreement does not mean the quotation, purchase order, and acceptance of purchase order were meaningless or "follow-up" documents. Although the parties may have reached a preliminary oral agreement, a written manifestation of that agreement was necessary for the contract to meet the statute of frauds. *See* TEX. BUS. & COM. CODE ANN. § 2.201(a) (West 2009) ("a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties"). Tecore's argument lacks merit.

B. **Oberholzer's Cover Letter to the Quotation**

Oberholzer's cover letter to the quotation stated the quotation was for "all new manufactured products," but AirWalk used retrofitted and existing products in Tecore's inventory to fill the order. Tecore argues that the quotation with Exhibit A's arbitration provision did not apply to those products that were not "all new manufactured products." We disagree. AirWalk's failure to use "all new manufactured equipment" may have been a breach of contract,[7] but Tecore does not explain how AirWalk's delivery of the retrofitted products was not pursuant to the quotation, purchase order, and acceptance of purchase order. The arbitration provision stated the parties agreed to arbitrate "any dispute or claim arising out of or relating to

---

[7] Whether the cover letter with the representation about "all new manufactured equipment" was part of the quotation and the parties' contract and whether AirWalk breached the contract by not using "all new manufactured equipment" is not before us, and we make no determination concerning these matters.

this Agreement, or the breach hereof." Tecore does not explain why the use of retrofitted equipment did not constitute a "dispute or claim arising out of or relating to this Agreement, or the breach hereof." This argument lacks merit.

### C. Doctrine of the Last Antecedent

Tecore next argues that even if the contract included the quotation with Exhibit A, the arbitration provision in Exhibit A was not part of the parties' contract. The terms and conditions on the face of the price-sheet page of the quotation stated, "This Quotation is subject to the following terms and conditions and as provided in Exhibit A attached hereto, the terms of which are incorporated herein." Tecore argues that applying the doctrine of the last antecedent, the only parts of Exhibit A incorporated into the terms and conditions on the price-list page were those that were also listed on the price-list page. Therefore, because the arbitration provision was not one of the terms and conditions on the same page as the price list, it was not incorporated by reference.

The doctrine of the last antecedent provides that a qualifying phrase must be confined to the words and phrases immediately preceding it to which it may, without impairing the meaning of the sentence, be applied. *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000). Tecore asserts that "as provided in Exhibit A attached hereto" is a qualifying phrase that must be applied to the words immediately preceding it, "the following terms and conditions."

We disagree. In the sentence, the phrases "the following" and "as provided in Exhibit A attached hereto" are descriptive, not qualifying. They describe where the "terms and conditions" that "[t]his Quotation is subject to" are to be found. The conjunction "and" indicates that "as provided in Exhibit A attached hereto" is in addition to the terms and conditions that are "following." "[T]he following" and "as provided in Exhibit A attached hereto" do not purport to

qualify, limit, or restrict anything. We conclude that the doctrine of the last antecedent does not apply.

We conclude the evidence supports the trial court's finding that AirWalk and Tecore had a contract consisting of the quotation, the purchase order, and the acceptance of the purchase order, and that the parties' contract included an agreement to arbitrate this dispute.

## Ambiguity of the Contract

Tecore also argues that "[b]ased on the preceding sections of this Brief," the quotation's Exhibit A "was at best ambiguous and subject to two or more reasonable interpretations on the issue whether Tecore intended to agree to an arbitration provision." Tecore does not explain how Exhibit A could be subject to two or more interpretations concerning arbitration. Nor does Tecore identify which of its numerous preceding arguments demonstrate that Exhibit A is ambiguous. Exhibit A clearly provided for arbitration. We conclude Tecore has failed to show Exhibit A was ambiguous regarding Tecore's intent to arbitrate.

Tecore also argues it was unclear which of the four versions of the purchase order became part of the parties' contract and, therefore, the contract was ambiguous. Tecore asserts that its executives claimed that version two of the purchase order applied and that AirWalk's executives believed that version four of the purchase order applied.[8] However, regardless of whether it was version two or version four of the purchase order that constituted Tecore's acceptance, any differences between the purchase orders did not affect whether the parties' agreement included the arbitration provision in Exhibit A. Tecore's action of sending the

---

[8] All four versions of the purchase order listed the same equipment at the same prices. Version 1 had the quotation number handwritten in, and it contained four additional terms: (1) the parties agreed "to use best commercial efforts to negotiate an OEM agreement addressing" various terms; (2) the order included 12 months of maintenance; (3) Tecore had seven business days to cancel or modify parts of the order; and (4) expected delivery dates. Terms (2) and (3) conflicted with Exhibit A, and AirWalk rejected the purchase order. Version 2 was identical to version 1 except it changed 12 months of maintenance to 12 months of warranty and it lined out by hand the term giving Tecore seven days to cancel or modify parts of the order. Version 3 contained no additional terms or handwriting except Gerrity's signature, but it did not reference the quotation number. Version 4 is identical to version 3 except it referenced the quotation number and stated, "Payment terms are 45 days from delivery."

purchase order constituted acceptance of the quotation, including the arbitration provision in Exhibit A.

We conclude the trial court did not err by determining the parties' agreement was not ambiguous as to whether the agreement included an arbitration provision.

## CONCLUSION

We conclude that any error from the trial court's finding that the parties agreed to arbitrate the issue of arbitrability was harmless because the trial court's independent review correctly determined the parties agreed to arbitrate their claims concerning the transaction at issue. We overrule Tecore's first and second issues. We also conclude the trial court did not err by determining the parties' agreement to arbitrate was not ambiguous. We overrule Tecore's third issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

120130F.P05

–19–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TECORE, INC., Appellant

No. 05-12-00130-CV          V.

AIRWALK COMMUNICATIONS, INC.,
Appellee

On Appeal from the 101st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 11-03801-E.
Opinion delivered by Justice Myers.
Justices Fillmore and Lewis participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

     It is **ORDERED** that appellee Airwalk Communications, Inc. recover its costs of this appeal from appellant Tecore, Inc.

Judgment entered this 4th day of December, 2013.


/Lana Myers/
LANA MYERS
JUSTICE