**Opinion issued August 7, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00837-CV

————————————

**BROWN LAB INVESTMENTS, LLC, JOEL KATZ, AND ANDREA KATZ,**
**Appellants**

**V.**

**LANE MOESSER, Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-35154**

---

## MEMORANDUM OPINION

Appellants, Brown Lab Investments, LLC ("Brown"), Joel Katz, and Andrea

Katz (the "Katzes"), challenge the trial court's order denying their motion to vacate,

and granting the motion of appellee, Lane Moesser, to confirm, an arbitration award.

In four issues, Brown and the Katzes argue that the trial court erred in confirming,

and not vacating, the award because the arbitrator "exceeded his powers" by determining the issue of arbitrability, by issuing an award against parties not subject to arbitration, and by awarding damages that are "inconsistent with" the terms of the agreements at issue.

We reverse and remand.

## Background

In 2011, Align Strategic Partners, LLC ("Align"),[1] a Delaware limited liability company with its principal place of business in Houston, Texas, was a recruiting firm that specialized in placing finance, accounting, and information-technology professionals in employment positions. The controlling interest in Align was held by Brown, a Delaware limited liability company with its principal place of business in Chicago, Illinois. The controlling interest in Brown was owned by the Katzes, who were residents of the State of Utah.

Moesser, in his Amended and Restated Summary of Dispute and Request for Relief, alleged that, in 2011, when Align was formed, Joel contacted him, along with other prospective owners, and "recruited them away from their positions at reputable employment recruiting companies with a promise of starting a new accountant recruiting business in which they would be part owners." Moesser became an employee and vice president of Align and an owner of a minority interest.

---

[1]    Align is not a party to this appeal. *See infra* note 5.

On September 12, 2011, Moesser and Align executed three contracts. They executed an Employment Agreement (the "Employment Agreement"), which governed the terms of Moesser's employment and required him to purchase a membership interest in Align. They executed a Membership Interest Purchase Agreement (the "Purchase Agreement"), pursuant to which Moesser purchased a 7.5 percent membership interest in Align, for which he ultimately paid $63,333. Further, they executed a Limited Liability Company Agreement (the "Operating Agreement"), which governed the operation of Align and its relationship with its members, including Moesser. The other members of Align included Brown, which held an 82.5 percent interest.

Andrea executed the Employment Agreement as a "representative[]" of Brown, and on behalf of Align, as follows:

> Authorized representatives of the parties have executed this Agreement as of the day and year first written above.
>
> The Company:  Align Strategic Partners, LLC
> [A] Delaware Limited Liability Company
>
> By:  Brown Lab Investments, LLC
>       By:  [signature (Andrea Katz)]
>             Andrea Katz
> Its:  Manager
>
> Employee:
> [signature (indecipherable)]          9-12-11
> Lane Moesser

She similarly executed the Purchase Agreement. Further, she executed the Operating Agreement as a "representative[]" of both Align, as the "Company," and Brown, as a member, as follows:

| | |
|---|---|
| Authorized representatives of the parties have executed this Agreement as of the Effective Date. | |
| ALIGN STRATEGIC PARTNERS, LLC [signature (Andrea Katz)] By: Brown Lab Investment/Andrea Katz Its [title] Manager | MEMBERS: Brown Lab Investments, LLC By: [signature], Manager Andrea Katz . . . . [signature (indecipherable)] Lane Moesser |

Moesser asserted that the Katzes, through their ownership of Brown, maintained control over the management of Align and the distribution of its profits to the minority shareholders. Although Align became a successful enterprise, the Katzes, through Brown, "took improper advantage of their majority status and began to siphon money away from the business in contravention of their fiduciary duties to their minority shareholders," including using Align's funds to partially finance their unrelated businesses; to pay individuals who were not providing services to Align; and to pay excessive travel expenses for the Katzes and excessive management fees to Andrea. Moesser asserted that the Katzes' conduct reduced the distribution of profits to the minority owners to nominal sums. In November 2014, after Moesser voiced objection to the alleged misuse of Align's funds, Joel

4

discharged him from his employment with Align. It is undisputed that Moesser's employment was terminated "without cause."

Subsequently, Align notified Moesser that it had chosen to exercise its contractual right to repurchase his membership interest, as follows:

> . . . . It is Align's view that an independent appraisal of the Purchased Interests is not worthwhile, as the fair market value of the Purchased Interests is substantially lower than the amount you paid for the Purchased Interests.

> By the time you receive this letter, you will have already received a wire transfer in the amount of $63,333.00, the amount you have paid for the Purchased Interests, representing the purchase price for the Purchased Interests in accordance with Section 4(b) of the Purchase Agreement. This amount is given to you in full satisfaction and repurchase of your membership interest in Align, and effective immediately you no longer have any rights with respect to the Purchased Interests.

Moesser rejected Align's repurchase, asserting that the value of his interest was not derived in accordance the terms of the Purchase Agreement. Section 4(b) of the Purchase Agreement, "Repurchase Rights of the Company," provides:

> In the event that the Employment Agreement between [Align] and the Subscriber [Moesser] dated September 12, 2011 . . . is terminated, then for a period of sixty days following such termination, [Align] shall have the option to repurchase the Purchased Interests from the Subscriber [Moesser], as follows:
>
> . . . .
>
> (b)    If the Employment Agreement is terminated by [Align] without Cause, . . . then *the price [Align] must pay upon the exercise of its option shall be **the higher of** . . . [the] price paid by [Moesser] for the Purchased Units as set forth in this Agreement,*

5

> *or the then current Agreed Value of the Purchased Units (as such term is defined in the [Operating Agreement]).*

(Emphasis added.) The Operating Agreement defines the term "Agreed Value" as "the fair market value of an asset as of the date of valuation, which shall be determined . . . by an independent appraiser selected by the Board of Managers."

After Moesser disputed Align's valuation of his interest, Align selected an appraiser and presented him with a "Summary Appraisal Report" (the "Report") by Stephen G. Pawlow, Senior Director, McGladrey LLP. In the Report, Pawlow concluded: "Based on the data, information, and analysis presented in this [Report], it is our opinion that the fair market value of [Moesser's interest in Align] was $42,375 on a minority, non-marketable basis as of December 31, 2014."

Moesser asserted that the Board of Managers, which he noted was controlled by the Katzes, had chosen the appraiser, and that the Report presented a "fundamentally flawed valuation analysis based upon entirely false and misleading data," provided by the Katzes, that "purport[ed] to value the entire enterprise at an amount roughly equal to the liquidation value of two-months-worth of outstanding receivables." Disputing the independence, validity, and accuracy of the report, Moesser, pursuant to the Operating Agreement and the Delaware Limited Liability Company Act, requested from Align copies of its financial records relevant to evaluating its "true fair market value." Align refused Moesser's request, asserting

that he had been "fully compensated" for his membership interest, was no longer a member of Align, and was thus not entitled to such information.

Align then filed a lawsuit against Moesser in a Court of Chancery of the State of Delaware,[2] seeking a declaration that it was not obligated to respond to Moesser's business records demands because Moesser had been paid in full for his membership interest and was therefore divested of any interest in Align. Align also asserted that Moesser had breached the Operating Agreement by disputing the repurchase of his interest. Moesser filed a motion to dismiss the Delaware action for lack of subject matter jurisdiction[3] on ground that the dispute was subject to an arbitration provision in the Employment Agreement, which states:

> Any dispute or claim arising [out of] or in any way related to this Agreement shall be settled by binding arbitration in Houston, Texas, but any dispute or controversy arising out of or interpreting this Agreement shall be settled in accordance with the laws of the State of Illinois as if this Agreement were executed and all actions were performed hereunder within the State of Illinois. All arbitration shall be conducted in accordance with the rules and regulations of the American Arbitration Association ("AAA"). . . .

The Delaware court concluded that, although only the Employment Agreement contains an arbitration clause, the Employment Agreement, Purchase

---

[2] *See Align Strategic Partners LLC v. Moesser*, C.A. No. 11240-VCN, 2016 WL 791261 (Del. Ch. Feb. 26, 2016). Brown and the Katzes were not named parties to the suit in the Delaware court.

[3] *See Dresser Indus., Inc. v. Global Indus., Techs., Inc.*, No. Civ. A. 16967, 1999 WL 413401, at *5 (Del. Ch. June 9, 1999) ("[I]f the claims a plaintiff seeks to litigate in this court are subject to arbitration, this court will dismiss the plaintiff's complaint for lack of subject matter jurisdiction.").

7

Agreement, and Operating Agreement each contain provisions that address, in varying degrees, Align's ability to repurchase Moesser's interest when his employment ended. The Employment Agreement provides for both Moesser's initial purchase of "units of membership interest" and Align's option to repurchase those units. The Purchase Agreement, which is attached to the Employment Agreement as an exhibit, provides a framework for Align's repurchase of Moesser's units. The Purchase Agreement does not, however, define several terms critical to determining how much Moesser is owed. Rather, terms such as "Agreed Value" are defined in the Operating Agreement. Thus, "read in concert, the three agreements define a process for determining how much Align 'must pay' Moesser for his Units should it decide to exercise its repurchase option upon termination of Moesser's Employment Agreement." The court concluded that the Employment Agreement's broad, generic arbitration clause applied to Moesser's dispute with Align. The court dismissed, in favor of arbitration, the portion of the suit regarding whether Align had effectively repurchased Moesser's ownership interest. The court stayed, pending the results of the arbitration, the remaining portion of the suit relating to Align's request for a declaration regarding Moesser's business records demand.

In the arbitration, Moesser brought claims against Align and he added claims against Brown, Joel, and Andrea, in their individual capacities, for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing,

8

fraud, conversion, and conspiracy. Moesser asserted that Align, Brown, Joel, and Andrea "were, at all material times, the alter egos of one another" and that the alleged acts and omissions of the defendant entities were engaged in by their officers and agents. He further asserted that Brown and the Katzes were third-party beneficiaries of the contracts that he had executed with Align. Moesser sought $1,000,000 in actual damages, $3,000,000 in exemplary damages, attorney's fees, interest, and costs.

Brown and the Katzes filed, with the arbitrator, "Objections to Arbitration," in which they objected to the jurisdiction of the AAA. They argued that the AAA did "not have the authority to adjudicate any dispute as to them in this arbitration" because they were not parties to the Employment Agreement and had not otherwise agreed to arbitrate the claims against them, as follows:

> [Brown and the Katzes] hereby object to arbitration in this matter as they have not agreed to arbitrate the claims asserted against them herein and have not otherwise agreed to be subject to the jurisdiction of the [AAA] in this matter.
>
> . . . .
>
> [Brown and the Katzes] object to being parties to this arbitration because the AAA does not have the authority to adjudicate any dispute as to them in this arbitration as they are not parties to the Employment Agreement and have not otherwise agreed to arbitrate the claims asserted herein. Furthermore, even if the Arbitrator determines that the arbitration provision in the Employment Agreement binds [Brown and the Katzes] to arbitrate the claims referred to in that provision, the claim asserted against them herein, being breach of fiduciary duty to Moesser as an owner of Align, is wholly unrelated to the Employment Agreement, and there is no agreement to arbitrate those claims.

9

Brown and the Katzes asked the arbitrator to dismiss them from the arbitration on the ground that the AAA had no jurisdiction over them and to award them their attorney's fees and costs "in making these objections." The arbitrator denied the objections, stating: "These three parties shall be included as Respondents in this arbitration."

Prior to the arbitration hearing, Brown and the Katzes filed a Pre-Hearing Brief, in which they again objected to the arbitrator's jurisdiction over them as parties to the arbitration. They objected to participating in the arbitration and asserted that the arbitrator lacked jurisdiction to enter any award against them.

At the arbitration hearing, counsel for Brown and the Katzes again objected:

> [W]e do object to and continue to object to the inclusion of [Brown, Joel, and Andrea] as respondents in this proceeding. . . . [T]hey are not party to any agreement that has an arbitration clause, they are not subject to arbitration, and as I think we've made clear, but I need to make clear on this record, we contend there's no jurisdiction over them here.

Following a hearing,[4] the arbitrator issued a Final Award, awarding Moesser $750,000 in "actual damages for all of the claims and causes of action" he asserted in the arbitration. The arbitrator ruled that, following payment of the award, Moesser "shall no longer hold any ownership interest in, and shall no longer be a member

---

[4]      Aside from very brief excerpts, the transcript of the hearing was not made part of the appellate record.

of," Align. The arbitrator further ruled that Align, Brown, Joel, and Andrea were jointly and severally liable for the award. The arbitrator denied Moesser's request for exemplary damages.

Moesser filed a petition to confirm the arbitration award against Align, Brown, and the Katzes. Align, Brown, and the Katzes filed a motion to vacate the award. As pertinent here, Brown and the Katzes asserted that they were not parties to any arbitration agreement with Moesser, had "never agreed to arbitrate any dispute with Moesser," and that the arbitrator "did not have jurisdiction" over them. Specifically, Andrea, as manager of Brown, had executed the agreements in a representative capacity, on behalf of Align, and not in an individual capacity. And, "Texas courts have repeatedly held" that signing a contract as an agent for a disclosed principal does not personally or individually bind the agent. Thus, Brown and the Katzes were non-signatories, i.e., non-parties, to "any agreement with Moesser that contained an arbitration clause."

Brown and the Katzes further asserted that, under both the Federal Arbitration Act ("FAA") and the Texas Arbitration Act ("TAA"), whether non-signatories to a contract are bound by an arbitration clause therein constitutes a threshold matter of arbitrability for the courts, and not arbitrators, to decide. And, they had "repeatedly and consistently" objected to being named in the arbitration. They asserted that the arbitrator had "exceeded his powers" by determining the issue of arbitrability, i.e.,

11

that they were parties to the arbitration, and that the trial court was required to conduct an independent review of whether they were parties to the arbitration agreement.

On September 16, 2016, the trial court granted Moesser's motion to confirm the arbitration award and denied the motion by Align, Brown, and the Katzes to vacate the award. After a hearing on October 17, 2016, the trial court entered a final judgment. On November 15, 2016, Align filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.[5]

## Arbitration Award

In a portion of their second issue, Brown and the Katzes argue that the trial court erred in confirming, and not vacating, the arbitration award because the arbitrator "exceeded his powers" by determining the issue of arbitrability. *See* 9 U.S.C. § 10(a)(4). They assert that the question of whether they, as non-signatories to the arbitration agreement, were bound, in their individual capacities, as parties to

---

[5] On October 18, 2016, Align, Brown, and the Katzes filed the instant appeal. Upon the subsequent filing of Align's Suggestion of Bankruptcy, this appeal was suspended. *See* TEX. R. APP. P. 8.3(b). Moesser, Brown, and the Katzes then filed a joint motion to sever Align's appeal so that the appeal between the remaining parties could proceed. Attached to the joint motion was an order of the bankruptcy court lifting the automatic stay solely as to the non-debtor parties, to allow their appeal to go forward. We granted the motion, severed Align's appeal into separate cause number 01-16-01019-CV, styled *Align Strategic Partners, LLC v. Lane Moesser*, where it remains suspended, and ordered the instant appeal restyled as *Brown Lab Investments, LLC, Joel Katz and Andrea Katz v. Lane Moesser*.

12

the arbitration constituted a threshold matter of arbitrability for the trial court, and not the arbitrator, to determine.

### Standard of Review and Principles of Law

We review a trial court's decision to vacate or confirm an arbitration award de novo based on a review of the entire record. *Port Arthur Steam Energy LP v. Oxbow Calcining LLC*, 416 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). Because judicial review "adds expense and delay, thereby diminishing the benefits of arbitration as an efficient, economical system for resolving disputes," *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002), review of an arbitration award is "extraordinarily narrow." *E. Tex. Salt Water Disposal Co. v. Werline*, 307 S.W.3d 267, 271 (Tex. 2010). An arbitration award is presumed valid and is entitled to great deference. *Royce Homes, L.P. v. Bates*, 315 S.W.3d 77, 85 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Every reasonable presumption must be indulged to uphold an arbitrator's decision, and none is indulged against it. *City of Baytown v. C.L. Winter, Inc.*, 886 S.W.2d 515, 518 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Judicial scrutiny of these awards focuses on the integrity of the arbitration process, not on the propriety of the result. *Women's Reg'l Healthcare, P.A. v. FemPartners of N. Tex., Inc.*, 175 S.W.3d 365, 367–68 (Tex. App.—Houston [1st Dist.] 2005, no pet.). A trial court may not vacate an arbitration award even if it is based upon a mistake of fact or law. *Universal Comput. Sys., Inc.*

13

*v. Dealer Sols., L.L.C.*, 183 S.W.3d 741, 752 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). An arbitration award has the same effect as a judgment of a court of last resort, and a reviewing court may not substitute its judgment for that of the arbitrator merely because it would have reached a different result. *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002); *J.J. Gregory Gourmet Servs., Inc. v. Antone's Imp. Co.*, 927 S.W.2d 31, 33 (Tex. App.—Houston [1st Dist.] 1995, no writ). A party seeking to vacate an arbitration award bears the burden of presenting a complete record that establishes grounds for vacating the award. *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 568 (Tex. App.—Dallas 2008, no pet.).

An arbitration award governed by the FAA must be confirmed, unless it is vacated, modified, or corrected on certain limited grounds.[6] *See* 9 U.S.C. § 9; *Thomas James Assocs., Inc. v. Owens*, 1 S.W.3d 315, 319–20 (Tex. App.—Dallas 1999, no pet.). One such ground is "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4); *Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 352 (5th Cir. 2009). Arbitrators exceed their powers if they decide matters not properly before them. *Ancor Holdings, LLC v. Peterson, Goldman & Villani, Inc.*, 294

---

[6]  The parties dispute whether the FAA or the TAA governs in this case. Brown and the Katzes, under this point in their brief, rely on both the FAA and the TAA. Moesser, in his brief, relies on the FAA. We apply the FAA and do not reach whether the TAA is applicable.

S.W.3d 818, 829 (Tex. App.—Dallas 2009, no pet.); *Barsness v. Scott*, 126 S.W.3d 232, 241 (Tex. App.—San Antonio 2003, pet. denied). For instance, an arbitrator exceeds his powers by issuing an award against a party who is not subject to arbitration. *Rapid Settlements, Ltd. v. Green*, 294 S.W.3d 701, 707 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 591 (2002) (internal quotations omitted). Whether a person or entity is a party to an arbitration agreement, and therefore bound by any award issued, presents a question of "arbitrability." *Id.* at 83, 123 S. Ct. at 591; *see also Leshin v. Oliva*, No. 04-14-00657-CV, 2015 WL 4554333, at *5 (Tex. App.—San Antonio July 29, 2015, no pet.) ("The question of arbitrability encompasses what claims may be submitted to arbitration and who can be bound to an arbitration agreement."). "Generally, only signatories to an arbitration agreement are bound by the agreement." *Elgohary v. Herrera*, 405 S.W.3d 785, 789–90 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006)); *see Roe v. Ladymon*, 318 S.W.3d 502, 510, 515 (Tex. App.—Dallas 2010, no pet.) (noting "foundational principle" that arbitration is matter of contract). For instance, "signing

15

a contract in a representative capacity does not bind the agent personally to the contract." *Elgohary*, 405 S.W.3d at 790–91.

Texas and federal law recognize, however, six theories under which a trial court could compel a non-signatory to arbitrate. *Id.* at 793 (citing *In re Merrill Lynch Trust Co.*, 235 S.W.3d 185, 191 (Tex. 2007), and *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003)). Those theories include: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, (5) estoppel, and (6) third-party beneficiary. *Bridas*, 345 F.3d at 356. These issues are to be resolved by the trial court before compelling a non-signatory to arbitrate. *See In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005) (reviewing whether trial court properly denied motion to compel non-signatory to arbitrate under direct benefits estoppel theory); *Roe*, 318 S.W.3d at 519–20 (holding that trial court properly determined that non-signatory was not bound either as agent for or as successor to signatory of contract); *Bridas*, 345 F.3d at 358–59 (reviewing trial court's independent review of whether non-signatory was bound to arbitrate under theories of agency, alter ego, estoppel, and third-party beneficiary).

Thus, "[w]hile non-signatories to an arbitration agreement can be bound to arbitrate under principles of contract and agency law, such issues—dealing as they do with non-signatories—are gateway 'issues of arbitrability' that the courts are primarily responsible for deciding—not the arbitrator." *Elgohary*, 405 S.W.3d at

16

790 (quoting *Roe*, 318 S.W.3d at 515); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296, 130 S. Ct. 2847, 2855–56 (2010).  A court should "decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently."  *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630–31 (5th Cir. 2014).

The question of arbitrability is an issue for judicial determination unless the parties "clearly and unmistakably" agreed to submit the issue of arbitrability to the arbitrator.  *Howsam*, 537 U.S. at 83, 123 S. Ct. at 591 ("Although the Court has also long recognized and enforced a 'liberal federal policy favoring arbitration agreements,' it has made clear that there is an exception to this policy:  The question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" (citations omitted)).

The Supreme Court has defined a "clear willingness to arbitrate" arbitrability as "a willingness to be effectively bound by the arbitrator's decision" on the issue of arbitrability.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946, 115 S. Ct. 1920, 1925 (1995).  Such a "willingness to be effectively bound" is not demonstrated by silence or ambiguity, or by "merely arguing the arbitrability issue to an arbitrator."  *Id.* at 945, 115 S. Ct. at 1925.  Rather, clear and unmistakable evidence of an agreement to arbitrate arbitrability includes a course of conduct

17

demonstrating assent, *see id*. at 946, 115 S. Ct. at 1925, or an express agreement to do so. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 79–80, 130 S. Ct. 2772, 2783 (2010) (Stevens, J., dissenting).

In *First Options*, the Supreme Court noted an "important qualification" applicable to when courts decide whether a party has agreed that arbitrators should decide arbitrability:

> Courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so. In this manner the law treats silence or ambiguity about the question "*who* (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement"—for in respect to this latter question the law reverses the presumption.

514 U.S. at 944–45, 115 S. Ct. at 1924 (citations omitted). Thus, in the context of the "who (primarily) should decide arbitrability question," the usual presumption in favor of arbitration, when the question concerns whether a particular dispute falls within the scope of a concededly binding arbitration agreement, is "reverse[d]." *Id.* at 945–46, 115 S. Ct. at 1924–25. Only in cases in which the reviewing court determines that the parties "clearly and unmistakably" agreed to submit arbitrability to the arbitrator does the court defer to the arbitrator's decision on the issue. *Id.* at 943, 115 S. Ct. at 1924; *Elgohary*, 405 S.W.3d at 790.

18

*Arbitrability*

Brown and the Katzes argue that the arbitrator "exceeded his powers" by determining the issue of arbitrability, i.e., that they, in their individual capacities, are parties to the arbitration agreement, because they did not sign the arbitration agreement in their individual capacities, they repeatedly and consistently objected to be being named in the arbitration, and there is simply no evidence that they clearly and unmistakably agreed to arbitrate the issue of arbitrability.

Moesser argues that Brown and the Katzes, in their individual capacities, "clearly and unmistakably" "consented to the arbitrator's authority to determine the jurisdictional question" because the express terms of the arbitration provision in the Employment Agreement incorporate the AAA rules, which bestow upon the arbitrator the authority to rule on his own jurisdiction.

Courts have held that, when it is *undisputed* that parties entered into a written arbitration agreement, "a court must examine the arbitration agreement to decide if, when construed under the relevant state law, the agreement evidences a clear and unmistakable intention that the arbitrators will have the authority to determine the scope of arbitration." *Saxa Inc. v. DFD Architecture Inc.*, 312 S.W.3d 224, 229 (Tex. App.—Dallas 2010, pet. denied).  In cases involving non-signatories to the arbitration agreement, however, "courts do not consider the terms of the arbitration agreement as any evidence" of an agreement to arbitrate the issue of arbitrability.

19

*Leshin*, 2015 WL 4554333, at *6. Federal substantive law of arbitrability resolves this question because the determination of whether a non-signatory is bound "presents no state law question of contract formation or validity." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738–39 (Tex. 2005) (internal quotations omitted); *see also Wa. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 267 n.6 (5th Cir. 2004) ("[N]early all federal circuit courts faced with the specific question . . . [of] to what extent a non-signatory is bound by an arbitration provision contained in a contract she is suing under have applied the federal substantive law of arbitrability to resolve the issue.").

Here, the record shows that Andrea executed not only the Employment Agreement, which contains the arbitration provision, but each of the other agreements, which the Delaware court held must necessarily be construed together, in her representative capacity as a "Manager" of Brown, which, in turn, was acting as an "authorized representative" of Align. None of the agreements in the record contain a signature by Joel. Notably, Moesser did not bring his claims against Brown, Andrea, or Joel in any representative capacities. Rather, he brought his claims against them in their individual capacities.

"[S]igning a contract in a representative capacity does not bind the agent personally to the contract." *Elgohary*, 405 S.W.3d at 791. Further, "[a]n agent in his individual capacity is a non-signatory when that agent signs an agreement with

20

an arbitration provision in his representative capacity." *Leshin*, 2015 WL 4554333, at \*6. In *DK Joint Venture 1 v. Weyand*, an arbitrator entered an award against two signatory corporations and two of their non-signatory officers. 649 F.3d 310, 313 (5th Cir. 2011). In reversing the district court's confirmation of the award, the United States Court of Appeals for the Fifth Circuit held that "the fact that the defendant corporations entered into the Subscription Agreements did not cause their agents, . . . who acted only as officers on behalf of the corporations to be personally bound by those agreements." *Id*. at 314–15, 320. The court held that the agents who signed the agreements only in their representative capacities were not bound by the terms of the arbitration provision contained therein. *Id*. at 315.

Thus, Brown, Andrea, and Joel, in their individual capacities, are non-signatories to the arbitration agreement. *See Elgohary*, 405 S.W.3d at 789 (identifying Herrera, in individual capacity, as non-signatory when he signed arbitration agreement as partner); *see also Leshin*, 2015 WL 4554333, at \*6 (holding that Leshin, who signed trust agreement, which contained arbitration provision, in his capacity as trustee, was, in his individual capacity, a non-signatory); *Roe*, 318 S.W.3d at 515 (holding partner's signature on contract did not render him party to contract in individual capacity). Because Brown, Andrea, and Joel are non-signatories to the arbitration agreement, the terms of the arbitration agreement do not constitute evidence that they, in their individual capacities, agreed to arbitrate

21

the question of arbitrability.[7] *See Leshin*, 2015 WL 4554333, at *6 ("In cases involving non-signatories, courts do not consider the terms of the arbitration agreement as any evidence when looking for 'clear and unmistakable evidence' as to whether parties agreed to arbitrate the issue of arbitrability."); *see also Elgohary*, 405 S.W.3d at 790 (stating that terms of contracting parties' agreement did not constitute evidence that nonparty agreed to arbitrate arbitrability).

In disputes concerning non-signatories, as here, the analysis focuses on whether there exists an agreement between the parties to the dispute before the court, not between the parties to the arbitration agreement itself. *First Options*, 514 U.S. at 944, 115 S. Ct. at 1924; *see also Roe*, 318 S.W.3d at 514.

The record shows that Brown and the Katzes, in their Objections to Arbitration, asserted that the arbitrator did "not have the authority to adjudicate any dispute as to them in this arbitration," as follows:

> [Brown and the Katzes] hereby object to arbitration in this matter as they have not agreed to arbitrate the claims asserted against them herein and have not otherwise agreed to be subject to the jurisdiction of the [AAA] in this matter.
>
> . . . .

---

[7] We do not reach whether Brown, Andrea, and Joel, as non-signatories to the arbitration agreement, might nevertheless be bound to arbitrate under principles of contract and agency law. *See Elgohary*, 405 S.W.3d at 790. There are three types of disputes concerning arbitration: (1) the merits of the dispute; (2) whether the parties agreed to arbitrate the merits; and (3) who has the primary power to decide whether the parties agreed to arbitrate the merits. *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir. 2014). Here, we consider only the third question.

> [Brown and the Katzes] object to being parties to this arbitration because the AAA does not have the authority to adjudicate any dispute as to them in this arbitration as they are not parties to the Employment Agreement and have not otherwise agreed to arbitrate the claims asserted herein. Furthermore, even if the Arbitrator determines that the arbitration provision in the Employment Agreement binds [Brown and the Katzes] to arbitrate the claims referred to in that provision, the claim asserted against them herein, being breach of fiduciary duty to Moesser as an owner of Align, is wholly unrelated to the Employment Agreement, and there is no agreement to arbitrate those claims.

Brown and the Katzes asked the arbitrator to dismiss them from the arbitration on the ground that the AAA had no jurisdiction over them and to award them their attorney's fees and costs "in making these objections."

Prior to the arbitration hearing, Brown and the Katzes filed a Pre-Hearing Brief, in which they again objected to the arbitrator's jurisdiction over them as parties to the arbitration. At the arbitration hearing, counsel for Brown and the Katzes again objected:

> [W]e do object to and continue to object to the inclusion of [Brown, Joel, and Andrea] as respondents in this proceeding. . . . [T]hey are not party to any agreement that has an arbitration clause, they are not subject to arbitration, and as I think we've made clear, but I need to make clear on this record, we contend there's no jurisdiction over them here.

In *First Options*, the United States Supreme Court considered whether Kaplan, the owner of a wholly owned company, and his wife were required to arbitrate, in their individual capacities, the question of arbitrability in a dispute between Kaplan's company and another firm, First Options. 514 U.S. at 941, 115

23

S. Ct. at 1922. While it was undisputed that Kaplan's *company* had agreed to arbitrate under the parties' agreement, the Kaplans asserted that, because they had not executed the agreement in their individual capacities, they were not obligated to arbitrate in their individual capacities. *Id.* at 941, 115 S. Ct. at 1922. First Options, the movant for arbitration, argued that Kaplan and his wife had clearly and unmistakably agreed to submit the issue of arbitrability to the arbitrators because they had argued the arbitrability issue in their objections to the arbitrator. *Id.* at 946, 115 S. Ct. at 1925. The Supreme Court held that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue." *Id.* Rather, a "clear willingness to arbitrate" arbitrability is demonstrated by evidence of "a willingness to be effectively bound by the arbitrator's decision" on the issue of arbitrability. *Id.* The Court noted that, "insofar as the Kaplans were forcefully objecting to the arbitrators deciding their dispute with First Options, one naturally would think that they did *not* want the arbitrators to have binding authority over them." *Id.*

The Court, in *First Options*, further noted that, although the Kaplans may have had, as First Options argued, other ways to obtain an independent court decision on the question of arbitrability without arguing the issue to the arbitrators (e.g., by trying to enjoin the arbitration or by refusing to participate in the arbitration and then defending against a motion to compel arbitration), such "simply [did] not say

anything about whether the Kaplans intended to be bound by the arbitrators' decision." *Id.* The Court concluded that the Kaplans "did not clearly agree to submit the question of arbitrability to arbitration," and the dispute was instead subject to independent review by the courts. *Id.* at 947, 115 S. Ct. at 1925–26.

Here, like in *First Options*, Brown and the Katzes' objections, prior to and during the arbitration, asserting that "the AAA *[did] not have the authority to adjudicate any dispute* as to them in th[e] arbitration as they [were] not parties to the Employment Agreement and ha[d] not otherwise agreed to arbitrate the claims asserted," and asking the arbitrator to dismiss them from the arbitration on the ground that the AAA was without jurisdiction over them, expressly evidences a desire *not* to be bound by the arbitrator's authority. *See id.* at 946, 115 S. Ct. at 1925 (emphasis added).

Moesser argues that Brown and the Katzes clearly and unmistakably agreed to submit the issue of arbitrability to the arbitrator because they not only also presented argument on the merits of whether they were bound to arbitrate, but they invoked the AAA, stating: "Pursuant to AAA Rule R-7(a), 'The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.'" Further, they "acknowledged that the arbitrator could conclude" that they were bound by the arbitration provision by stating: "[E]ven if the Arbitrator determined that the

25

Employment Agreement somehow binds [Brown and the Katzes] to arbitrate" related claims, Moesser's breach-of-fiduciary-duty claim "was wholly unrelated to the Employment Agreement." Moesser asserts that Brown and the Katzes, having represented to the arbitrator that he had the authority to determine arbitrability and asking him to do so, cannot now complain that he lacked authority to decide the issue.

Again, Brown and the Katzes having "merely argu[ed] the arbitrability issue to an arbitrator" in support of their *objections*, "does not indicate a clear willingness" to be bound by the arbitrator's decision on arbitrability and to forego independent judicial review. *See First Options*, 514 U.S. at 946–47, 115 S. Ct. at 1925 (noting rather that arbitrator can make "initial (but independently reviewable) arbitrability determination"). That Brown and the Katzes referenced the AAA rule granting the arbitrator the authority to decide his jurisdiction and noted that the arbitrator's ruling on their objections and request for dismissal necessarily encompassed certain determinations does not constitute a course of demonstrating assent or "clear and unmistakable" evidence that they intended to be bound by the arbitrator's decision as to arbitrability. *See id.* at 947, 115 S. Ct. at 1926; *Leshin*, 2015 WL 4554333, at *6. ("[T]he fact that [the AAA] rules allow an arbitrator to decide his own jurisdiction is also not clear and unmistakable evidence of a non-signatory's agreement to arbitrate the issue of arbitrability."). Moreover, a "willingness to be

26

effectively bound" by the arbitrator's decision on the issue of arbitrability is not demonstrated by ambiguity. *First Options*, 514 U.S. at 944–45, 115 S. Ct. at 1924–25.

We conclude that the question of whether Brown and the Katzes, in their individual capacities, are parties to the arbitration agreement was a matter for the trial court, and not the arbitrator. *See id.* at 943, 115 S. Ct. at 1924; *Elgohary*, 405 S.W.3d at 793–94; *see also Leshin*, 2015 WL 4554333, at *6–7; *see also Southwinds Express Constr., L.L.C. v. D.H. Griffin of Tex., Inc.*, 513 S.W.3d 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Because the trial court, and not the arbitrator, should have decided the "gateway issue" of whether Brown and the Katzes agreed to be bound by arbitration, the arbitrator exceeded his authority. *See Elgohary*, 405 S.W.3d at 793. We hold that the trial court erred in confirming, and not vacating, the arbitration award.

We sustain the portion of Brown and the Katzes' second issue in which they argue that the trial court erred in confirming, and not vacating, the arbitration award because the arbitrator "exceeded his powers" by determining the issue of arbitrability.

27

**Conclusion**

We reverse the judgment of the trial court and remand for further proceedings so that the trial court may conduct an independent review on the issue of arbitrability.[8] *See id.* at 794.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

---

[8]    In light of this disposition, we need not address the remaining issues.